**GRANDVIEW LOT OWNERS ASSOCIATION, INC., Appellant–Defendant,**

v.

**Thomas D. HARMON and Mary Harmon, Appellees– Plaintiffs.**

No. 03A01–0010–CV–336.

Court of Appeals of Indiana.

Aug. 16, 2001.

---

David W. Stone, IV, Stone Law Office & Legal Research, Anderson, IN, Patrick W. Harrison, Beck Harrison & Dalmbert, Columbus, IN, Attorneys for Appellant.

Jeffrey S. Washburn, Sharpnack Bigley LLP, Columbus, IN, Michael L. Rogers, Rogers & Dove, North Vernon, IN, Attorneys for Appellees.

## OPINION

FRIEDLANDER, Judge.

Grandview Lot Owners Association, Inc. (GLOA) is an association of landowners whose property fronts Grandview Lake, a private lake in Bartholomew County, Indiana. Thomas and Mary Harmon purchased property near the lake and expressed a desire to use the lake for recreational purposes. When GLOA opposed the Harmons, the Harmons filed a lawsuit against GLOA, seeking a declaratory judgment granting them access to the lake. Both parties filed motions for summary judgment. The trial court granted the Harmons' motion and denied GLOA's motion. GLOA appeals those rulings.[1]

We reverse and remand.

The relevant facts in this case are not in dispute and are as follows. The Grandview Development Company created the Plat (the Plat) of the Town of Grandview Lake (the Town), and the Commissioners of Bartholomew County approved the Plat in 1953. Paragraph 15 of the Plat provided that the lake was to be used only by "lot owners", *Record* at 137, and their guests. Paragraph 15 of the First through Fifth additions to the Town and Paragraph 13 of the Sixth, Seventh, and Eighth Additions to the Town set forth the same restriction. Paragraph 19 of the Plat dedicated the lake to "the use of lot owners fronting on or adjacent to said Lake [and] to their guests." *Record* at 137. In 1957, the Grandview Development Company created, and the Commissioners of Bartholomew County approved, the Fifth Addition to the Town. The plat thereby created included nine lots and a parcel of land that was designated "Block A", and which is at the center of the instant controversy. The nine lots fronted Grandview Lake. Block A consisted of a 3.33–acre parcel of land that was located across a road (Pond Road) that ran behind (that is, on the side opposite of the lake) the nine lots in the Fifth Addition. Block A was conveyed from one owner to another until it was purchased by Dr. Robert Morgan in June 1995.

The Harmons owned lot 335, which fronted Grandview Lake. By virtue of ownership of lot 335, the Harmons were members of GLOA. On August 8, 1995, the Harmons purchased Block A from Morgan. On June 26, 1997, GLOA's president informed the Harmons that neither they nor their guests would be permitted to use Grandview Woods, Grandview Lake, or the dam and launching ramps servicing the lake.[2] On April 6, 2000, the Harmons subdivided Block A into three separate lots, thereby creating the Harmon Minor

---

1. On May 11, 2001, GLOA filed a Verified Motion for Permission to File Amended Brief in order to correct a factual misstatement on page 7 of the appellant's brief. That motion is hereby granted.

2. Bradley Stinebring, then president of GLOA, subsequently acknowledged at a deposition that, at the time of the June 26, 1997, the Harmons had the right to access the lake by virtue of their ownership of lot 335, and that the notification was therefore in error in that respect.

Subdivision (the Harmon Subdivision). The three lots in Block A are the only lots in the several plats constituting the Town of Grandview Lake that are not lakefront lots. It is undisputed that, so long as they own lot 335, or any lakefront lot on Grandview Lake, the Harmons are authorized to access Grandview Lake and its facilities. The question presented here concerns the rights that attach to ownership of the lots in Block A.

The trial court determined that the owners of the lots in Block A have a right to access and use the lake. In support of its determination, the trial court entered findings of fact and conclusions of law. In the context of a summary judgment ruling, the trial court is neither required to, nor prohibited from, entering findings and conclusions. When it does, the specific findings aid in our review of the ruling, but are not binding upon the reviewing court. *City of Gary v. Indiana Bell Telephone Co., Inc.,* 732 N.E.2d 149 (Ind.2000). When reviewing a summary judgment ruling, we stand in the shoes of the trial court. *Id.* Summary judgment is appropriate only if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Ind. Trial Rule 56(C); *City of Gary v. Indiana Bell Telephone Co., Inc.,* 732 N.E.2d 149. In conducting our review, we will not reweigh the evidence and will consider the facts in the light most favorable to the nonmoving party. *City of Gary v. Indiana Bell Telephone Co., Inc.,* 732 N.E.2d 149.

■ We must determine the meaning of the restrictive covenants incorporated in the Plat with respect to the permissible use of the lake by owners of the lots in the Harmon Subdivision. Construction of the terms of a written contract is a pure question of law for the court and we conduct a de novo review of the trial court's conclusions in that regard. *Harrison v. Thomas,*

744 N.E.2d 977 (Ind.Ct.App.2001). If a contract is ambiguous because of the language used in the contract, rather than because of extrinsic facts, its construction is a pure question of law to be determined by the court. *Id.* One purpose of restrictive covenants is to maintain or enhance the value of land "by controlling the nature and use of lands subject to a covenant's provisions." *Campbell v. Spade,* 617 N.E.2d 580, 583 (Ind.Ct.App.1993). Restrictive covenants are generally disfavored in the law and will be strictly construed by the courts, which resolve all doubts in favor of the free use of property and against restrictions. *Id.* Nevertheless, restrictive covenants are a form of express contract recognized under the law. The construction of a written contract containing restrictive covenants is a question of law for which summary judgment is particularly appropriate. *Id.*

■ The original covenanters' intent must be determined from the specific language used and the situation as it existed at the time that the covenant was made. *Columbia Club, Inc. v. American Fletcher Realty Corp.,* 720 N.E.2d 411 (Ind.Ct.App. 1999); *Oakes v. Hattabaugh,* 631 N.E.2d 949 (Ind.Ct.App.1994). Specific words and phrases cannot be read exclusive of other contractual provisions. Rather, the parties' intentions when entering into the contract must be determined by reading the contract in its entirety and attempting to construe contractual provisions so as to harmonize the agreement. *First Fed. Sav. Bank v. Key Markets, Inc.,* 559 N.E.2d 600 (Ind.1990).

■ When lands are granted according to a plat, the plat becomes part of the grant or deed by which the land is conveyed, with respect to the limitations placed upon the land. A duly recorded plat gives notice to all prospective purchasers of the restrictions contained therein.

*Maxwell v. Hahn,* 508 N.E.2d 555 (Ind.Ct. App.1987). Therefore, the question of whether a Block A landowner acquires thereby the right to use the lake must be resolved by examining the written instruments that created the Town in general, and Block A in particular. We begin our analysis there.

The Fifth Addition, of which Block A was a part, was platted on January 5, 1957. The Privileges and Restrictions section of the plat contained the following provisions:

Sale of all lots in the 5th Addition to the Town of Grandview Lake will be made with privileges herein stated and subject to the restrictions hereinafter set out.

1. Use of boats and motors and water safety shall be regulated by a majority vote of all lot owners now owning or who may hereafter own lots fronting on said lake, each such lot shall be entitled to one vote.

2. All lots except those reserved by Grandview Development Company, Incorporated, for business purposes shall be known and described as residential lots. . . .

\* \* \* \* \*

15. The public is restricted from use of the Grandview Lake, except as guests of residential lot owners or as guests of Grandview Development Company, Incorporated, and guests of a proposed resort hotel. Grandview Development Company, Incorporated, assumes responsibility for enforcement of this restriction.

\* \* \* \* \*

17. Conveyance of all lots fronting on said Lake will be made subject to the restrictions herein set forth, which restrictions are made covenants running with that land for the benefit of all present and future owners of all lots fronting on said Lake and shall be binding upon the grantees and all persons claiming under them until January 1, 1964, at which time said covenants shall be automatically extended for successive periods of five (5) years unless by vote of a majority of the then owners of the lots it is agreed to change said covenants in whole or in part.

\* \* \* \* \*

19. Grandview Lake is dedicated to the use of lot owners fronting on or adjacent to said Lake, to their guests, to the Grandview Development Company, Incorporated, and the guests of said Corporation.

*Record* at 159–162.

We observe that the aforementioned language reveals two significant ambiguities that require this court to construe the meaning of the contract and determine the parties' intent. The first ambiguity concerns the meaning of the term "adjacent", as used in Paragraph 19 of the Privileges and Restrictions section of the Plat. The second ambiguity concerns the parties' intent with respect to whether a party possesses a legal right to access the lake by virtue of ownership of the land that originally comprised Block A.

■ We address first the Harmons' contention that Paragraph 15 confers upon owners of the lots in the Harmon Subdivision a right to use the lake. They note that Paragraph 2 provides that "all lots ... shall be known as residential lots." *Record* at 162. They then cite the language in Paragraph 15 to the effect that "guests of residential lot owners" are not restricted from using the lake. *Record* at 160. Finally, they note that the Harmon Subdivision lots are part of Block A, which was platted in the original Town of Grandview Lake plat. Thus, the reasoning goes,

because Paragraph 15 confers a right to use the lake upon the *guests* of all lot owners, including those in the Harmon Subdivision, it logically follows that the *owner* of that lot also has a right to use the lake. The Harmons' analysis is flawed in that the reasoning is backward. The owner's rights are not derivative of the guest's; rather, the guest's are derivative of the owner's. The various relevant instruments must be construed with this principle in mind. Therefore, we must determine the rights conferred upon the owners of land in Block A.

Paragraph 19 indicates that Grandview Lake is dedicated to the use of owners of lots that are either lakefront lots or lots adjacent to the lake. It is undisputed that the lots in the Harmon Subdivision are not lakefront lots. The parties disagree, however, on the question of whether those lots are "adjacent" to the lake within the meaning of Paragraph 19. The Harmons contend that the lots in Block A are adjacent to the lake because they are located near the lake and because they "are the only parcels of real estate in the entire Grandview Lake development which do not have frontage on the lake." Appellees' Brief at 14. GLOA, on the other hand, contends that "adjacent" in this context should be synonymous with "fronting." We reject both constructions of the term.

We will not presume that the covenanters intended for "adjacent" to be synonymous with "fronting," because such would render the term "adjacent" mere surplusage. *See Harrison v. Thomas,* 744 N.E.2d 977 (Ind.Ct.App.2001) (the court will attempt to construe the language in a contract so as not to render any terms ineffective or meaningless). Neither do we accept the Harmons' argument that "adjacent" referred to the only parcel of land that was not included in the descriptive phrase "lakefront lots", or phrases to that

effect. This meaning results in an interpretation whereby a right to use the lake would be conferred upon the owners of all lots in the plat. Had the covenanters intended this construction, they would presumably have indicated such by couching it in such all-inclusive terms as "all" or "every".

■ Rejecting the aforementioned interpretations of "adjacent," we now consider the meaning of that term in this context by applying the rules of construction. "Words used in a contract are to be given their usual and common meaning unless, from the contract and the subject matter thereof, it is clear that some other meaning was intended." *Exide Corp. v. Millwright Riggers, Inc.,* 727 N.E.2d 473, 478–79 (Ind.Ct.App.2000). *Webster's Third New International Dictionary* (1986) defines "adjacent" as "[n]ot distant or far off; nearby but not touching; relatively near and having nothing of the same kind intervening; having a common border." *Webster's Dictionary* at 26.

At first glance, the various definitions of the term appear to cut both ways. That is, there seems to be support both for the argument that the term implies mere physical proximity, and for the argument that it requires a touching or, in this case, a common boundary. We discern, however, one meaning that incorporates parts of both concepts, *viz.,* "relatively near and having nothing of the same kind intervening." "Adjacency" under this definition would require a special kind of physical proximity, but not necessarily a touching. In order to be considered adjacent in cases where there is no touching, however, an object must be the nearest of its kind to the other object in question. This critical aspect of the meaning of the term "adjacent" is emphasized in *Merriam–Webster's OnLine Collegiate Dictionary, available at* www.m-w.com/cgi-bin/dictionary, which

sets forth the following definition for "adjacent": "*ADJACENT* may or may not imply contact but always implies absence of anything of the same kind in between[.]" In our view, the latter explanation conveys the essence of the term as used in Paragraph 19.

Consistent with this meaning, a parcel would be adjacent to the lake so long as there were nothing of the same kind, i.e., another parcel of platted land, between that parcel and Grandview Lake. With respect to Block A, there were lakefront lots lying between it and the lake. It is the fact that those lots intervene in this manner, and not the distance from Block A to the lakefront, that leads us to conclude that Block A is not "adjacent" to the lake as that term is used in Paragraph 19 of the Privileges and Restrictions section of the plat. Therefore, the owners of the lots in the Harmon Subdivision do not have a right to use the lake by virtue of owning lots "adjacent" to the lake.

 The second ambiguity arising in the relevant documents concerns the parties' intent with respect to whether a party possesses a legal right to access the lake by virtue of ownership of the land that comprised Block A. The opening sentence of the Privileges and Restrictions section of the plat of the Fifth Addition subjects "all lots" in that Addition to the privileges and restrictions set forth in that document. *Record* at 162. The plat map reflects not only that Block A was the only parcel that did not front the lake, but also that it was the only parcel that was not designated as a "lot" and assigned a number. The significance of this is not altered by the fact that the Harmons subsequently divided Block A into lots. *Cf. McIntyre v. Baker,* 660 N.E.2d 348 (Ind.Ct.App.1996) (an owner cannot modify restrictions on the plat by merely replatting some of the lots in the plat). This would appear to exclude Block A from the land subject to those restrictions and privileges.

The intent that the ownership of Block A did not bestow lake rights is conveyed in other portions of the Privileges and Restrictions document. Paragraph 2 provides that water safety and the use of boats and motors shall be regulated by a majority vote of owners owning "lots fronting on said lake, each such lot shall be entitled to one vote." *Record* at 162. This provision is inconsistent with an interpretation that Block A owners have access to the lake. Specifically, such would result in a situation whereby, of all permissible users of the lake, the owners of Block A would be the only ones excluded from participating in the promulgation of the rules and regulations by which their use would be governed.

Further, paragraph 17 provides,

Conveyance of all lots fronting on said Lake will be made subject to the restrictions herein set forth, which restrictions are made covenants running with the land for the benefit of all present and future owners of all lots fronting on said Lake and shall be binding upon the grantees and all persons claiming under them . . . .

*Record* at 159. This paragraph mentions only lakefront lots, thereby subjecting only those parcels to the restrictive covenants. It may be inferred that because owners of non-lakefront property have none of the obligations and restrictions imposed upon lakefront owners, they have none of the privileges either.

As indicated previously, Paragraph 19 provides that the lake is dedicated "to the use of lot owners fronting on or adjacent to said Lake, to their guests, to the Grandview Development Company, Incorporated, and the guests of said Corporation." *Record* at 159. The Harmons concede that

Block A and the lots into which it was divided are not lakefront property. We have previously determined that Block A and any lots into which it was divided are not "adjacent" to the lake, as that term is used in the Privileges and Restrictions. Therefore, Paragraph 19 indicates that the owners of Block A do not have the right to use the lake by virtue of that status.

Finally, we note that the record contains the affidavit of William D. Hooker. Hooker's affidavit explains his views and their relevance on the issue in question, as follows:

5. I worked as a real estate salesman for Herron and Smith, who was the listing real estate broker for lots in the Grandview Lake Development owned by Grandview Development Company, Incorporated, starting in January, 1956. During this time I worked selling Grandview Lake lots. Herron and Smith became Lynn E. Smith Realty Company in the spring of 1956, and I continued working for that company as a real estate agent selling Grandview Lake lots. Lynn E. Smith Realty Company was the listing agent for the Grandview Lake lots owned by Grandview Development Company, Incorporated. I continued in this capacity until approximately July, 1963. I personally knew Philip W. Long and the intentions of Grandview Development Company, Incorporated as it related to BLOCK "A" in the Fifth Addition Plat.

\* \* \* \* \*

9. It was never the intention of Grandview Development Company, Incorporated, or its President, Phillip A. Long, to grant any privileges to the owner(s) of BLOCK "A" or any lots created on any portion of BLOCK "A" after the date of the Fifth Addition Plat to use Grandview Lake at any time, or under any circumstance.

10. When the Fifth Addition Plat was created, BLOCK "A" became a surplus piece of land after creating the lakefront lots. BLOCK "A" does not front on Grandview Lake, and it is separated from Grandview Lake by Pond Drive and by lots fronting on Grandview Lake.

\* \* \* \* \*

12. Grandview Development Company Incorporated did not intend for any owners of BLOCK "A" to have any rights to use Grandview Lake.

13. There was never any intention by Grandview Development Company in platting BLOCK "A" in the Fifth Addition Plat to confer upon any owner of this real estate or any part thereof, any right to use Grandview Lake.

*Record* at 383, 385–86. Although Hooker's affidavit is not, by itself, sufficient to establish the intent of the Grandview Development Company with respect to whether Block A ownership conferred lake access, it is at least minimally relevant on that subject.

The same can be said of the By–Laws of the Grandview Lot Owners Association, Inc. (the By–Laws). GLOA was not formed until 1967, approximately fourteen years after the Town was platted and approximately ten years after the Fifth Addition was platted. Accordingly, GLOA's by-laws cannot aid in discerning the intent of the parties when they prepared and agreed to the Town and Fifth Addition plats. Along with several other occurrences that postdated the platting of the Town and the Fifth Addition, however, it may serve to reflect that intent in practice.

In opposing the Harmons' summary judgment motion and in support of their own summary judgment motion, GLOA

presented the affidavits of William Hooker, Rick Agnew, Judith Cox, and Kim Jones. As indicated previously, Hooker was a salesman for the Realtor that originally listed Grandview Lake lots. Eventually, Hooker formed a corporation called Grandview Estates, Inc., which purchased Block A on July 3, 1963. On July 30, 1990, Grandview Estates, Inc. conveyed Block A to Dr. Robert Morgan and Professional Arts O.B.-Gyn, Inc., Profit Sharing Plan (Professional Arts) for "ONE DOLLAR ($1.00) and other valuable considerations." *Record* at 396. Hooker negotiated with Morgan and Professional Arts on behalf of Grandview Estates. Hooker "clearly told Dr. Morgan that no owner of Block A would ever have any rights to use Grandview Lake." *Record* at 386.

Rick Agnew owned the lot on Grandview Lake that was located directly across Pond Road from Block A. At one time, Agnew was interested in purchasing Block A. He decided not to purchase the parcel, however, when his investigation led him to conclude that the owners of Block A would not be able to use Grandview Lake because it did not front the lake. Agnew had been acquainted with Harmon for many years. Agnew spoke with Harmon when the Harmons were considering purchasing Block A. Agnew told Harmon the results of his investigation with respect to whether ownership of Block A conferred a right to use the lake. Harmon responded "that the only way he would be allowed to purchase the house and lot fronting on Grandview Lake .... was to also purchase BLOCK 'A'". *Record* at 425.

Judith A. Cox was the Secretary of GLOA from 1982 until October 1999. During that time, Cox was contacted "on numerous occasions" by parties interested in buying Block A, who specifically asked whether ownership of Block A property conferred the right to use the lake. Cox's response to such inquiries was that "Block A was not a lakefront lot and its owner(s) would not be entitled to use Grandview Lake." *Record* at 426. In her affidavit, Cox divulged one final circumstance indicating that the original covenanters did not intend that Block A owners should have access to Grandview Lake:

8. During the years that I served as Secretary for GLOA, dues and substantial assessments were billed to members of GLOA be used to maintain and repair the dam of Grandview Lake and purchase additional land, among other things. No owner of BLOCK "A" was billed for nor paid any dues or assessments assessed to BLOCK "A", no owner of BLOCK "A" has ever contributed toward the maintenance and repair of the dam of Grandview Lake or toward any other matter relating to Grandview Lake.

*Record* at 427.

We reiterate that we have not considered the aforementioned affidavits in trying to discern the intent of the original covenanters with respect to a Block A owner's right to use the lake. They do serve to verify our conclusion that those who platted the town and the Fifth Addition did not intend to confer such a right. Namely, those affidavits establish that, from the beginning, (1) no Block A owner has ever had access to the lake by virtue of that ownership, (2) everyone who purchased or contemplated purchasing the property, including the Harmons, was informed that Block A ownership did not confer the right to use the lake, and (3) Block A owners had never shared in bearing the costs associated with repairing and maintaining the lake and its facilities.

For the reasons set forth above, we conclude that the trial court erred in granting the Harmons' motion for summary judgment. As there remains no

question of fact, and considering the nature of the issue before us, we also necessarily conclude that the trial court erred in denying GLOA's motion for summary judgment. We therefore reverse the entry of summary judgment in favor of the Harmons, and remand with instructions to enter summary judgment in favor of GLOA.

Judgment reversed and remanded.

RILEY, J., and SULLIVAN, J., concur.