

FILED

May 05 2020, 9:26 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Mark J. Crandley
Barnes & Thornburg, LLP
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Louis F. Britton
Scott Craig
Cox Zwerner Gambill & Sullivan
Terre Haute, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Blake B. Hartman,

*Appellant-Plaintiff,*

v.

BigInch Fabricators &
Construction Holding Company,
Inc.,

*Appellee-Defendant.*

May 5, 2020

Court of Appeals Case No. 19A-PL-2263

Appeal from the Parke Circuit Court

The Honorable Hunter J. Reece, Special Judge

Trial Court Cause No. 61C01-1809-PL-394

**Riley, Judge.**

# STATEMENT OF THE CASE

Appellant-Plaintiff, Blake B. Hartman (Hartman), appeals the trial court's summary judgment in favor of Appellee-Defendant, BigInch Fabricators & Construction Holding Company (Company), concluding that, pursuant to the Shareholder Agreement, the value of the shares held by a minority shareholder can be discounted by lack of control and lack of marketability.

We reverse.

# ISSUE

Hartman presents one issue on appeal, which we restate as: Whether, as a matter of law, the value of shares under a buyback provision in a Shareholder Agreement can be discounted for lack of marketability and control when the Company is required to purchase the shares.

# FACTS AND PROCEDURAL HISTORY

The Company is a closely-held Indiana corporation, located in Montezuma, Indiana, and is in the business of fabricating and installing natural gas and pipeline compressor/pumping stations and related apparatus. Hartman was one of the founders and former president of the Company, serving as president from 1998 to 2014. At all times relevant to these proceedings, there were ten shareholders in the corporation, with no single shareholder holding a majority position.

On March 1, 2006, the shareholders of the corporate predecessor to the Company entered into a Shareholder Agreement that included the obligations of the shareholders to each other and to the Company. The Company's shareholders and directors executed a Consent to Corporate Action that bound the Company to the terms of the Shareholder Agreement. The Shareholder Agreement required the Company to purchase the shares of any shareholder who is involuntarily terminated as an officer or director of the Company. Pursuant to the provisions of the Shareholder Agreement, this purchase must be made at "appraised market value on the last day of the year preceding the valuation, determined in accordance with generally accepted accounting principles by a third-party valuation company." (Appellant's App. Vol. II, pp. 57-58).

In March 2018, Hartman was involuntarily terminated from his position as a director and officer at the Company, triggering the required purchase provisions in the Shareholder Agreement. To comply with the terms of the Shareholder Agreement, the Company retained Wonch Valuation Advisors (Wonch) to appraise the value of Hartman's shares. Wonch's report valued Hartman's 8,884—or 17.77%--shares at $3,526,060. The report discounted this amount due to Hartman's lack of controlling interest in the Company and lack of marketability as he did not have a market in which to sell his shares. As such, the report determined the fair market value of the shares to be $2,398,000. The Shareholder Agreement afforded Hartman the right to dispute Wonch's

valuation by obtaining a second professional appraisal. Hartman declined to avail himself of that option.

[7] On September 10, 2018, Hartman filed a petition for declaratory judgment, seeking a declaration as to the value of the shares and alleging that the Company improperly applied discounts for lack of control and marketability to the mandatory sale of the shares. On December 26, 2018, the Company filed an Answer and Counterclaim for declaratory judgment. On March 12, 2019, Hartman moved for summary judgment, and on May 13, 2019, the Company filed a cross-motion for summary judgment. On August 22, 2019, the trial court conducted argument on the parties' respective motion for summary judgment. One month later, on September 19, 2019, the trial court issued summary judgment, concluding that the Company could discount the value of the shares for lack of control and marketability.

[8] Hartman now appeals. Additional facts will be provided as necessary.

# DISCUSSION AND DECISION

## I. *Standard of Review*

[9] In reviewing a trial court's ruling on summary judgment, this court stands in the shoes of the trial court, applying the same standards in deciding whether to affirm or reverse summary judgment. *First Farmers Bank & Trust Co. v. Whorley*, 891 N.E.2d 604, 607 (Ind. Ct. App. 2008), *trans. denied*. Thus, on appeal, we must determine whether there is a genuine issue of material fact and whether the trial court has correctly applied the law. *Id*. at 607-08. In doing so, we

consider all of the designated evidence in the light most favorable to the non-moving party. *Id*. at 608. A fact is 'material' for summary judgment purposes if it helps to prove or disprove an essential element of the plaintiff's cause of action; a factual issue is 'genuine' if the trier of fact is required to resolve an opposing party's different version of the underlying facts. *Ind. Farmers Mut. Ins. Group v. Blaskie*, 727 N.E.2d 13, 15 (Ind. 2000). The party appealing the grant of summary judgment has the burden of persuading this court that the trial court's ruling was improper. *First Farmers Bank & Trust Co.*, 891 N.E.2d at 607.

[10] We observe that, in the present case, the trial court entered findings of fact and conclusions of law thereon in support of its judgment. Generally, special findings are not required in summary judgment proceedings and are not binding on appeal. *AutoXchange.com. Inc. v. Dreyer and Reinbold, Inc.*, 816 N.E.2d 40, 48 (Ind. Ct. App. 2004). However, such findings offer a court valuable insight into the trial court's rationale and facilitate appellate review. *Id.*

## II. *Buyback Provision*

[11] Hartman contends that the trial court inappropriately allowed the Company to reduce the value of his shares with a lack of marketability and control discount even though these discounts are not applicable to a compulsory sale. He maintains that the language of the Shareholder Agreement, determining the valuation method of the Company's shares, should not be equated with fair market value as the sale of the shares cannot be completed in the open market place and the purchaser already controls the Company.

Construction of the terms of a written contract is a pure question of law for the court, and we conduct a *de novo* review of the trial court's conclusions in that regard. *Grandview Lot Owners Ass'n, Inc. v. Harmon*, 754 N.E.2d 554, 557 (Ind. Ct. App. 2001). If a contract is ambiguous because of the language used in the contract, rather than because of extrinsic facts, its construction is a pure question of law to be determined by the court. *Id*. A contract is not ambiguous merely because a controversy exists where each party favors a different interpretation; rather, a contract is ambiguous where it is susceptible to more than one interpretation and reasonably intelligent persons would honestly differ as to its meaning. *Ind. Dep't of Transp. v. Shelly & Sands, Inc.*, 756 N.E.2d 1063, 1069-70 (Ind. Ct. App. 2001), *trans. denied*. Absent ambiguity, this court will give the terms of a contract their plain and ordinary meaning. *Id*. at 1070.

Indiana courts have long recognized that shareholders in closely-held corporations may enter into agreements to buy or sell shares which include a valuation method to determine the value of those shares. *See Shriner v. Sheehan*, 773 N.E.2d 833, 843 (Ind. Ct. App. 2002) ("It is for the parties, not the court, to stipulate a valuation method in a purchase agreement, and we will not rewrite an explicit agreement even if that method does not produce a price for the shares of stock that reflects a business's true value."). Close corporations generally find no market for their shares and the only people interested in the business are the "incorporated partners" who are intimately involved with the entity. *Krukemeier v. Krukemeier Mach. & Tool Co.*, 551 N.E.2d 885, 890 (Ind. Ct. App. 1990). Because there is often no market, it is difficult and speculative to

value a close corporation's shares; therefore, repurchase agreements frequently include specific valuation methods. *See Shriner*, 773 N.E.2d at 842.

[14] Article V of the Shareholder Agreement provides for the "Valuation and Payment for the Shares" in Section 5.1 as follows:

> The price per Share for the Shares of the Corporation to be sold pursuant to Article III or Article IV of this Agreement shall be the **appraised market value** on the last day of the year preceding the valuation, determined in accordance with generally accepted accounting principles by a third party valuation company within the twenty-four months preceding the transfer of shares, with adjustments for changes in the number of outstanding Shares since such year end, and in the case of sales under Article IV, if the value is less than the price paid to acquire the Shares paid by the Involuntary Transferee.

(Appellant's App. Vol. II, pp. 57-58) (emphasis added). In determining the appraised value of Hartman's shares, the Wonch report applied the fair market value, which included a discount for the marketability of the stocks and the lack of control represented by Hartman's minority interest.

[15] In support of his argument that the Wonch report applied an incorrect valuation method as appraised market value cannot be equated to fair market value, Hartman relies on *Wenzel v. Hopper & Galliher, P.C.*, 779 N.E.2d 30 (Ind. Ct. App. 2002). In *Wenzel*, this court rejected marketability and control discounts in a dispute about the value of a departing partner's interest in a law firm. *Id*. at 37. The firm brought an action to value the partner's interest under the Indiana Professional Corporations Act and asserted that the valuation must consider

both marketability and control. *Id*. We rejected the argument and adopted the general proposition that 'fair value' is not the same as 'fair market value.' *Id*. We found that 'fair value' carried with it the statutory purpose that shareholders be fairly compensated, which may or may not equate with the market's judgment about the stock's value. *Id*. 'Fair market value,' on the other hand, represented "the amount for which property will sell upon negotiations in the open market between an owner willing to sell and a buyer willing but not obligated to buy." *Id*. The *Wenzel* court explained that

> Minority and marketability discounts are open market concepts. A minority discount allows an appraiser to adjust for lack of control over the corporation on the theory that minority shares of stock are not worth the same amount to a third party as the majority holdings due to lack of voting power. A marketability discount allows an appraiser to adjust for a lack of liquidity in the stock itself on the theory that there is a limited supply of purchasers of the stock.

*Id*. at 37 (citations omitted). *Wenzel* recognized that a "substantial majority" of courts in other jurisdictions had reached the same result and "rejected the application of minority and marketability discounts when determining the fair value of stock in cases where a majority shareholder or corporation purchases the stock." *Id*. at 38. Acknowledging that the discounts would create a "windfall" if applied to a sale outside the open market, the *Wenzel* court clarified that a sale of the minority shareholders' shares to majority shareholders consolidates or increases the power of those already in control, so applying a minority discount to such a case would result in a windfall to the

purchasing majority shareholder, particularly because the shares would have the same value in the minority shareholder's hands as in the majority shareholders. *Id.* at 39.

Cases applying Indiana law since *Wenzel* have affirmed that minority and control discounts have no application in compelled transactions to a controlling party. In *Stone v. Peoples Tr. & Sav. Bank*, 363 F. Supp. 2d 1036, 1039 (S.D. Ind. 2005), the Southern District of Indiana rejected a marketability discount where there is "a ready-made market." Relying on *Wentzel*, the court concluded that "[i]t would be incongruous to discount the shares of the minority shareholder for lack of liquidity when valuation is being done in connection with a proceeding that creates liquidity." *Id.* (quoting *Wenzel*, 779 N.E.2d at 40)(quoting Charles W. Murdock, *The Evolution of Effective Remedies For and Valuation of Minority Shareholders and Its Impact Upon Valuation of Minority Shares*, 65 NOTRE DAME L. REV. 425, 486 (1990)). When there is a "ready-made market" for shares through a mandatory purchase agreement, "[a]llowing a minority or non-marketability discount to be deducted from their value would indeed amount to a windfall to the [buyer] and its majority shareholders, which is precisely what the *Wenzel* court sought to avoid." *Stone*, 363 F. Supp. 2d at 1039.

In the years since *Wenzel* was decided, a wide majority of courts in sister states have regularly rejected the application of control and marketability discounts to situations where a shareholder is compelled to sell to the majority. *See, e.g.*, *In re Stebnitz*, 586 B.R. 289 (E.D. Wisc. 2018) (finding no need for a lack of control

discount when the controlling interests bought the stock and holding that a "discount for lack of marketability is likewise inappropriate when the agreement obligates the remaining membership groups to purchase the existing member's interest."); *Shawnee Telecom Resources, Inc. v. Brown*, 354 S.W.3d 542, 555 (Ky. 2011); *HMO-W Inc. v. SSM Health Care Sys.*, 611 N.W.2d 250, 257 (Wis. 2000) (marketability and control discounts "inflict a double penalty upon the minority shareholder [because] the shareholder not only lacks control over corporate decision making, but also upon the application of a minority discount receives less than proportional value for loss of that control.").

[18]    In response, the Company distinguishes *Wenzel* and its progeny on the ground that the dispute in *Wenzel* revolved around the determination of fair value of minority shareholder's interest, as required by statutory language, and not the shares' market value, as included in the Shareholder Agreement.[1] Instead, the Company relies on the Wonch report and contends that the fair market value standard used in the report is consistent with the Shareholder Agreement's

---

[1] In a footnote, the Company directs us to *Alexander v. Alexander*, 927 N.E.2d 926, 938 (Ind. Ct. App. 2010) in support of its argument that "Indiana courts have approved the application of marketability and control discounts for valuations of shares in closely-held corporations when they were not bound by a statutory requirement of 'fair value.'" Appellee's Br. p. 12 n.1. However, we distinguished *Alexander* from *Wenzel* based on two considerations, none of which are present here. First, we noted the trial court's broad discretion when determining the value of property in dissolution proceedings which differentiated the circumstances in *Alexander* from those in *Wenzel*. "This broad discretion leads to a more direct and simple valuation of how the trial court has valued property than was presented in *Wenzel*." *Id*. Furthermore, unlike the facts in *Wenzel*, the party in *Alexander* was not selling her interest in the property—rather the trial court was attempting to valuate the property in light of the divorce proceedings. *Id*. at 939. Therefore, the trial court was not acting to prevent a windfall to the majority, but rather was trying to place a value on the interest. *Id*.

requirement to use appraised market value. Reiterating the trial court's conclusion, the Company focuses on dictionary definitions which indicate that market value and fair market value are remarkably similar. Black's Law Dictionary defines 'fair market value' as "[t]he amount at which property would change hands between a willing buyer and a willing seller, neither being under a compulsion to sell and both having reasonable knowledge of the relevant facts." BLACK'S LAW DICTIONARY, (6th Edition). 'Market value' is defined as "[t]he price property would command in the open market. The highest price a willing buyer would pay and a willing seller accept, both being fully informed, and the property being exposed for a reasonable period of time." BLACK'S LAW DICTIONARY, (6th Edition). Likewise, Indiana Code section 23-1-43-11 of the Indiana Business Corporation Act, defined the term market value as meaning fair market value. While this statute deals with the open-market concepts of share valuations in the context of mergers and other business combinations, the Company relies on it for its instructive value in this context. As such, the Company contends that Wonch properly applied a fair market value in performing his appraisal and the application of the discounts should stand.

[19] We find *Wenzel* to be persuasive to the situation at hand where a Shareholder Agreement includes the valuation method of the members' shares. Unlike Hartman's argument, we cannot conclude that *Wenzel* is limited to cases arising under the statutory application of the fair value standard; *Wenzel* and its progeny rejected the application of open-market discounts to any sale occurring

in a closed market, regardless of the used valuation standard. The Shareholder Agreement itself recognizes that the mandated buyback of shares to the Company differs from a sale to a third party on the open market and thus, different interests must be recognized by implementing an appraised market value rather than the open-market valuation method of fair value or fair market value. Indiana law does not allow parties "to read into the contract terms to which the parties did not agree." *Zawistoski v. Gene B. Glick Co.*, 727 N.E.2d 790, 794 (Ind. Ct. App. 2000). Courts therefore will not add provisions not agreed upon by the parties. *Kaghann's Korner, Inc. v. Brown & Sons Fuel Co., Inc.*, 706 N.E.2d 556, 565 (Ind. Ct. App. 1999).

[20] Wonch's appraisal report narrated that "[Wonch] ha[d] been engaged by the Company to estimate the fair market value of the property described herein as of December 31, 2017. This valuation was performed solely to assist with a valuation requirement in a shareholder agreement due to a triggering event involving [Hartman]." (Appellant's App. Vol. II, p. 72). After determining the market value of the shares, the report then applied the open market concepts of minority and marketability discounts, as required by the concept of fair market value. *See Wenzel*, 779 N.E.2d at 39. Thus, instead of using the "appraised market value" of the Shareholder Agreement, the Wonch report applied the open-market valuation method of fair market value, without acknowledging that there is a built-in market or that Hartman's shares must be sold to those already controlling the Company. As such, the Wonch report's application of the valuation method would allow the Company to purchase Hartman's shares

at a discount and then immediately retain control over the Company and resell the shares without the discount, thereby allowing the Company to reap a windfall.

[21] The Shareholder Agreement ensured a market for the shares of departing shareholders by compelling the Company to buy the shares at appraised market value. The Wonch report appraised the market value of the Company and calculated the per share value of this total market value figure by dividing the Company's value by the number of shares, resulting in a per share price of $396.90. Based on the 8,884 shares owned by Hartman, his share of the appraised market value of the Company amounted to $3,526,060. This reflects the appraised value of the shares based on the market value of the Company and corresponds with the requirement of the Shareholder Agreement to utilize the appraised market value. As there is no sale of the shares in the open market, the discounts for lack of control and marketability cannot be taken into account in the calculation of the shares' value in this compelled transaction. Consequently, as the trial court erred, as a matter of law, by applying these discounts, we reverse the trial court's summary judgment.

# CONCLUSION

[22] Based on the foregoing, we hold that, as a matter of law, the value of shares under the buyback provision in the Shareholder Agreement, which required to apply the appraised market valuation, cannot be discounted for lack of marketability and control when the Company is required to purchase the shares.

Reversed.

Mathias, J. concurs

Tavitas, J. concurs in part and dissents in part with separate opinion

# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Blake B. Hartman, *Appellant-Plaintiff,* <br><br> v. <br><br> BigInch Fabrication & Construction Holding Company, Inc., *Appellee-Defendant.* | Court of Appeals Case No. 19A-PL-2263 |

**Tavitas, Judge concurring in part and dissenting in part**

I respectfully concur in part and dissent in part.

I fully concur that the trial court erred by granting the Company's motion for summary judgment. I write separately to also emphasize and note that, in calculating the "fair market value," the Wonch report relied upon an Internal Revenue Service ("IRS") Revenue Ruling, which defines "fair market value" as "the price at which the property would change hands between a willing buyer and a willing seller when the former is not under any compulsion to buy and the latter is not under any compulsion to sell, both parties having reasonable knowledge of relevant facts." Appellant's App. Vol. II p. 69. Hartman, however, was involuntarily removed from his position, and the Company is required to purchase Hartman's shares at the "appraised market value." Under

these circumstances, the Company was under a compulsion to buy, and Hartman was under a compulsion to sell. Accordingly, the IRS definition of fair market value is not applicable here.

[26] I dissent only to the extent that the majority opinion fails to address Hartman's motion for summary judgment in its conclusion. *See* Appellant's Br. p. 23 ("Mr. Hartman respectfully requests that the Court reverse the summary judgment in favor of the Company and enter summary judgment in his favor declaring that he is entitled to the $3,526,000 his shares are worth without the inapplicable discounts."). I would reverse both the trial court's grant of the Company's motion for summary judgment and the trial court's implied denial of Hartman's motion for summary judgment.