**INDIANA DEPARTMENT OF TRANSPORTATION, Appellant–Defendant,**

v.

**SHELLY & SANDS, INC., Appellee–Plaintiff.**

No. 29A02–0103–CV–165.

Court of Appeals of Indiana.

Oct. 23, 2001.

Steve Carter, Attorney General of Indiana, Michael T. Schaefer, Deputy Attorney General, Vincent Mirkov, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellant.

Joseph H. Yeager, Jr., Carl R. Pedworth, Shawna M. Eikenberry, Baker & Daniels, Indianapolis, IN, Attorneys for Appellee.

## OPINION

VAIDIK, Judge.

### Case Summary

This interlocutory appeal involves summary judgment rulings between the Indiana Department of Transportation (the Department) and Shelly & Sands, Inc. (the Contractor) concerning a dispute over compensation for road reconstruction work. The Department appeals the denial of its summary judgment motion. We find that the exculpatory clause contained in the contract between the Department and the Contractor limited damages resulting from any delays caused by utility relocation to an extension of the project completion date. We further find that the Indiana Tort Claims Act bars the Contractor's claim for constructive fraud and request for the remedy of estoppel. Therefore, we reverse the denial of summary judgment against the Department.

### Facts and Procedural History

On January 14, 1995, the Department and the city of Carmel entered into a Local Public Agency Agreement through which the Department would administer federal funds to pay for road reconstruction work on a stretch of East 116th Street. Appellant's App. P.562. As part of the agreement, the Department was responsible for preparing the Engineer's Estimate for the project, advertising for construction bids, and awarding the contract to the most acceptable bid if it was within 5% of the Engineer's Estimate. Appellant's App. P.565. In preparation for the road reconstruction, Carmel entered into a series of utility agreements to relocate utility facilities situated along the affected stretch of roadway, which were operated by PSI Energy, Inc.; Citizens Gas and Coke Utility; Indianapolis Power and Light Company; Jones, Intercable, Inc.; Indiana Gas Company, Inc.; and Ameritech. Appellant's App. P.361–80.

Thereafter, the Department circulated a 166–page bid package to various contractors so that they could prepare bids for the project before the Department let the contract on March 21, 1995, to the most acceptable bid. Appellant's App. P.381. The bid package referenced and made certain revisions to the Standard Specifications—a published book adopted by the Department that contains the standard specifications and general provisions for government contracts. Appellant's App. P.404; 105 Ind.Admin.Code 11–1–28. Among other provisions, the bid package contained estimates on when the various utilities in the area would be able to relocate their facilities to allow for the roadwork to proceed. Appellant's App. P.411. Based on the bid package, the Contractor bid $3,803,426.26 to serve as general contractor on the project, and the Department awarded the contract to the Contractor. The Department and the Contractor finalized the Highway Contract on April 14, 1995. Appellant's App. P.23.

Before the contract was awarded, the Department held a utility coordination meeting to discuss the timetables for utility relocation in the project area. Appellant's App. P.577. At the meeting, the utilities provided the Department with the following estimates: Ameritech estimated that utility relocation would begin June 1 and conclude July 15; PSI Energy, Inc. estimated that relocation would be completed by May 31; and Indiana Gas estimated that relocation would be completed by July 1. Appellant's App. P.577. After the contract was finalized, the Department held a Preconstruction Conference that included representatives from the Contractor and the three utilities. Appellant's App. P.602. At the conference, the utilities reiterated their estimates for when the relocation of their facilities along the affected stretch of roadway would be completed.

The Department then issued its Engineer's Notice to Proceed with Construction to the Contractor with a completion date for the project set for May 17, 1996. Appellant's App. P.612. The Contractor began construction on the project on May 16, 1995; however, numerous conflicts in the timetable for utility relocation delayed the construction work as a whole. While Indiana Gas was able to complete its relocation by its set date, PSI Energy did not finish utility relocation until nearly 11 weeks after its estimated completion date, and Ameritech finished relocation over three months after its estimated time of completion. Appellant's App. P.577. Based on these utility relocation delays, the Contractor requested that the completion date for the project be extended until November 1, 1996. Appellant's App. P.575. The Department agreed to extend the completion date to October 28, 1996, and released the Contractor from 165 days of liquidated damages totaling $82,500 that had accumulated from the May 17 deadline. Appellant's App. P.578–79.

Prior to completion of the project, the Contractor submitted a notice to the Department alerting the Department that it would file a claim for the additional costs arising from the delays when those costs could be fully ascertained. Appellant's App. P.28. Because the project ran 165 days past the original completion date, the Contractor later estimated that it and its subcontractors accumulated additional costs of $1,245,670 over the original bid price. Appellant's App. P.316. The Department denied the claim in its entirety. Appellant's App. P.559–60.

A little over one year after the project was completed, the Contractor commenced this court action against the Department for the additional costs alleging: (1) that the Department breached its contract in a number of ways by failing to cause the

proper and timely relocation of the utilities; (2) that it would be inequitable for the Contractor to bear the loss caused by the delay in the utility relocation; and (3) that the Department's superior knowledge and course of conduct under the contract would secure an unconscionable advantage and constitute constructive fraud. Appellant's App. P.14–21. The Department moved for summary judgment and to strike a jury demand, and the trial court denied both motions. This interlocutory appeal ensued.

### Discussion and Decision

■■■ Our summary judgment standard of review is well settled. The party appealing the denial of summary judgment has the burden of persuading this court that the trial court's ruling was improper. *Zurich Am. Ins. Group v. Wynkoop,* 746 N.E.2d 985, 988 (Ind.Ct.App.2001). Upon review of the denial of a motion for summary judgment, we apply the same standard as the trial court. *Id.* We will resolve any doubt as to fact or inference to be drawn from the evidence in favor of the party opposing the motion. *Clark v. CSX Transp., Inc.,* 737 N.E.2d 752, 757 (Ind.Ct. App.2000), *reh'g denied.* Summary judgment should be granted only when the designated evidence shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Ind. Trial Rule 56(C); *Clark,* 737 N.E.2d at 757. Therefore, on appeal, we must determine whether there is a genuine issue of material fact and whether the trial court has correctly applied the law. *Zurich Am. Ins. Group,* 746 N.E.2d at 988.

### I. Breach of Contract

The Department argues that the trial court erred by refusing to grant its motion for summary judgment on the Contractor's contract claims. Specifically, the Department alleges that the Contractor's claims

for damages under the contract for delays caused by utility relocation should be barred by an exculpatory clause in the contract, which specifically limited the remedy for delays caused by utility relocation to an extension of the project's completion date. We agree.

In the written contract for the road reconstruction, the Department and the Contractor agreed "[t]hat the accompanying proposal, certifications, and bond of the Contractor, together with the plans, Standard Specifications, Supplemental Specifications, and special provisions herein designated and referred to, [were] made a part of the contract, the same as if herein fully set forth." Appellant's App. P.23. Both parties agreed to incorporate into the contract the Standard Specifications, a published book adopted by the Department that contains the standard specifications and general provisions for contracts entered into by the Department, and all other supplemental specifications that had been adopted by the Department since the last time the Standard Specifications book was published.

### A. Contract Ambiguity

■■■ The Department asserts that language in the Standard Specifications book unambiguously limits the remedy for utility relocation delays to an extension of the project completion date. Generally, construction of a written contract is a question of law for which summary judgment is particularly appropriate. *Orem v. Ivy Tech State Coll.,* 711 N.E.2d 864, 870 (Ind. Ct.App.1999), *trans. denied.* The determination of whether a contract is ambiguous is also a question of law for the court. *Bernstein v. Glavin,* 725 N.E.2d 455, 459 (Ind.Ct.App.2000), *trans. denied.* A contract is not ambiguous merely because a controversy exists where each party favors a different interpretation; rather a contract is ambiguous where it is susceptible

to more than one interpretation and reasonably intelligent persons would honestly differ as to its meaning. *Id.* Absent ambiguity, this court will give the terms of a contract their plain and ordinary meaning. *Centennial Mortgage, Inc. v. Blumenfeld,* 745 N.E.2d 268, 273–74 (Ind.Ct.App.2001).

The Standard Specifications book contains two provisions that specifically relate to utility relocation. The provisions read in pertinent part:

§ 105.06 Cooperation with Utilities. Prior to letting the contract, the Department will notify all known utility companies, all pipe line owners, or other parties affected, and endeavor to have all necessary adjustments of the public or private utility fixtures, pipe lines, and other appurtenances within or adjacent to the limits of construction, made as soon as practicable.

. . . .

The plans show all known utilities located within the limits of the contract according to information obtained from the various utility companies. The accuracy of the plans in this respect is not guaranteed by the Department. All of the permanent and temporary utility appurtenances in their present or relocated positions shall have been considered in the bid. *No additional compensation will be allowed for delays, inconvenience, or damage sustained by the Contractor due to interference from the said utility appurtenances or the operations of moving them.* However, if the prosecution of the work is delayed unnecessarily by the removal or relocation of the utilities, the *time for completion may be extended* in such amount as the condition justifies, provided the delay was not caused by negligence of the Contractor.

Appellant's App. P.61–62 (emphasis added).

§ 107.19 Contractor's Responsibility for Utility Property and Services.

. . . .

*The Contractor shall assume all risk and liability for any inconvenience, delay, or expense that may be occasioned by public utilities* or other public or private property within the limits of the proposed improvement, whether or not such property is shown on the plans. *However, time for completion of the contract may be extended in accordance with 105.06.* Regardless of previous notification by the Department, the Contractor shall give notice to the owners of each utility located within the contract limits, or which might be affected by the work, in sufficient time before beginning work for the owners to relocate or protect their property. No work shall be done which injures or damages such property until satisfactory arrangements have been completed with the owners for its protection, relocation, or reconstruction.

Appellant's App. P.64. (emphasis added). The Department argues that these two provisions establish that the only remedy for delays caused by the relocation of utilities in the area of the road reconstruction is that the "time for completion [of the project] may be extended." Appellant's App. P.62.

■ In countering this argument, the Contractor contends that the language contained in Appellant's § 105.06 is internally inconsistent because it establishes a duty on the part of the Department while at the same time relieving the Department from all liability if it fails in this task. We disagree. Section 105.06 does establish that the Department will notify all of the affected utility companies in the area of the upcoming roadwork and that the Department will try to have all of the adjustments to the utility fixtures made as soon

as possible. While the contract does bar any additional compensation for delays, inconvenience, or damages caused by utility relocation, it provides that the project completion date may be extended if there are unnecessary delays. The exculpatory clause contained in § 105.06 does not relieve the Department of its duty under the contract; it merely shifts the risk of loss to the Contractor and limits the remedy if delays in the relocation process occur.

Limiting the remedy for relocation delays does not render the Department's contractual obligations meaningless. The contract provides that unnecessary delays in the removal or relocation of the utilities may justify extending the completion date for the project; such unnecessary delays would encompass delays caused by a breach of the Department's contractual obligations. Assuming that the Department somehow breached its contractual obligation by failing to use every weapon in its arsenal to force the utilities to relocate in an expeditious manner, the contract provides that the remedy for this type of unnecessary delay is limited to an extension of time for the completion of the project. The language of § 105.06 is not internally inconsistent because it creates a contractual obligation while at the same time limiting the remedy for delays.

▮ The Contractor also asserts that the exculpatory clause concerning utility relocation is ambiguous when coupled with a clause relating to differing site conditions. The additional clause in the Standard Specifications book is taken from the Code of Federal Regulations and reads in pertinent part:

> § 104.02 Differing Site Conditions, Suspension of Work and Significant Changes in the Character of Work.
>
> During the progress of the work, if *subsurface or latent physical conditions are encountered at the site differing materially from those indicated in the contract or if unknown physical conditions of an unusual nature, differing materially from those ordinarily encountered and generally recognized as inherent in the work provided for in the contract,* are encountered at the site, the party discovering such conditions shall promptly notify the other party in writing of the specific differing conditions before the site is disturbed and before the affected work is performed.
>
> Upon written notification, the Engineer will investigate the conditions, and if it is determined that the conditions materially differ and cause an increase in the cost or time required for the performance of any work under the contract, an adjustment, excluding anticipated profits, will be made and the contract modified in writing accordingly. The Engineer will notify the Contractor of the determination whether or not an adjustment of the contract is warranted.
>
> No contract adjustment which results in a benefit to the Contractor will be allowed unless the Contractor has provided the required written notice.

Appellant's App. P.650; 23 C.F.R § 635.109 (2001). The Contractor argues that delays in utility relocation should be interpreted to be subsurface or latent physical conditions or unknown physical conditions of an unusual nature, differing materially from those ordinarily encountered and generally recognized as inherent in the work provided for in the contract. The Contractor then asserts that according to this interpretation, the contract is ambiguous because § 104.02 allows for contract cost adjustments based on unknown physical conditions while §§ 105.06 and 107.19 limit the remedy for utility relocation delays to time completion extensions. We find that there is no ambiguity created by these clauses because the Con-

tractor's underlying interpretation is flawed.

The utility fixtures, pipe lines, and other appurtenances that needed to be relocated for the roadwork to proceed were not unknown physical conditions. The utility fixtures were contemplated in the plans for the project and in the contract. Appellant's App. P.410–12. While the delays in the relocation of the utility fixtures may have been unexpectedly long, the underlying physical condition was known and identified in the contract. The presence of the utilities was known; it was the delay in their relocation that was unexpected. A delay in the relocation of utility fixtures cannot be interpreted to be an unknown physical condition when the utility fixtures were identified in the contract and their relocation was also contemplated in the contract. Thus, we conclude that the contract language is not ambiguous.

### B. Exculpatory Clause Validity

■■■■ The Contractor argues that even if the exculpatory language in the contract language is not ambiguous, it is not specific enough to bar the Contractor's breach of contract claims and it is not enforceable for public policy reasons. Courts in Indiana recognize exculpatory clauses in contracts and presume that the contracts represent the freely bargained agreement of the parties. *Trimble v. Ameritech Pub., Inc.*, 700 N.E.2d 1128, 1129 (Ind.1998). No public policy exists to prevent contracts containing exculpatory clauses. *Pinnacle Computer Servs., Inc. v. Ameritech Pub., Inc.*, 642 N.E.2d 1011, 1014 (Ind.Ct.App.1994), *reh'g denied.* However, some exceptions do exist where the parties have unequal bargaining power, the contract is unconscionable, or the transaction affects the public interest such as utilities, carriers, and other types of businesses generally thought to be suitable for regulation or which are thought of as a practical necessity for some members of the public. *Id.*

### 1. Specificity

■■■ The Contractor asserts that if the Department sought to contractually absolve itself of liability for its failure to have the utility relocation occur as soon as practicable, the contract must specifically state that the Department's own misconduct is exculpated. This argument is best understood as one of nonspecificity rather than ambiguity. *Powell v. Am. Health Fitness Ctr. of Fort Wayne, Inc.*, 694 N.E.2d 757, 760 (Ind.Ct.App.1998). For support, the Contractor cites a number of cases in which we declared that in order for a party to contractually absolve itself of liability for its own negligence "the exculpatory clause must both specifically and explicitly refer to the negligence of the party seeking release from liability." *Powell*, 694 N.E.2d at 761; *see also Exide Corp. v. Millwright Riggers, Inc.*, 727 N.E.2d 473, 480 (Ind.Ct.App.2000), *trans. denied; Marsh v. Dixon*, 707 N.E.2d 998, 1000–01 (Ind.Ct.App.1999), *trans. denied.* While the Contractor is correct that an exculpatory clause absolving a party of liability for its own negligence must specifically refer to that party's negligence, the Contractor's argument is misplaced. The Contractor's claim is for breach of contract, not negligence. While the language in the exculpatory clause may not be specific enough to bar a claim of negligence if the Contractor had brought such a claim, that is not a question that we must resolve.

■■■ The Contractor charged that the Department breached the contract by not using every means available to expedite utility relocation and then by not reimbursing the Contractor for additional costs that resulted from delays caused by the relocation. The contract provides that "[n]o additional compensation will be al-

lowed for delays, inconvenience, or damage sustained by the Contractor due to interference from the said utility appurtenances or the operations of moving them." Appellant's App. P.61–62. This was not open-ended exculpatory language; this type of "no-damage-for-delay" exculpatory clause contained in the contract clearly contemplated delays caused by utility relocation, precluded additional compensation for this particular type of delay damage and limited the remedy for the delay to an extension of time. The cause of the delays was the utility relocation, and the contract precluded compensation for delays based on utility relocation. The contract identified this possibility for delay with sufficient specificity to absolve the Department of liability when this eventuality occurred.

### 2. *Public Policy*

In addition, the Contractor argues that even if the exculpatory language was sufficiently specific, it is still unenforceable under public policy grounds. Despite the very strong presumption of enforceability, "courts have refused to enforce private agreements that contravene statute, clearly tend to injure the public in some way, or are otherwise contrary to the declared public policy of Indiana." *Trimble,* 700 N.E.2d at 1129 (quoting *Fresh Cut, Inc. v. Fazli,* 650 N.E.2d 1126, 1130 (Ind.1995)). The Contractor alleges that the exculpatory clause in this contract is unenforceable under all three of these criteria.

■■■■ The Contractor argues that the "no-damage-for-delay" exculpatory clause is unenforceable because it eviscerates a statute that authorizes the Department to order utilities to relocate the utilities' facilities and coordinate the relocation.[1] We disagree. Because Indiana values the freedom to contract so highly, "we will not find that a contract contravenes a statute unless the language of

the implicated statute is clear and unambiguous that the legislature intended that the courts not be available for either party to enforce a bargain made in violation thereof." *Cont'l Basketball Ass'n, Inc. v. Ellenstein Enters., Inc.,* 669 N.E.2d 134, 140 (Ind.1996). In this case, the exculpatory clause was not in violation of any statute. The Department's decision to contract itself out of liability for delays that could result from utility relocation would not prevent it from ordering the various utilities to relocate their facilities if they initially refused. The clause merely shifted the risk of delay from the Department to the Contractor; it did not prevent the Department from performing any action. We do not conclude that the exculpatory clause contravenes any relevant statutes.

■■■■ We also do not find that the enforcement of such an exculpatory clause would injure the public. While upholding the "no-delay-for-damages" clause will place the burden of delays from utility relocation on the Contractor's shoulders, such an allocation of risk does not directly injure the public. The Contractor argues that the exculpatory clause in the contract ultimately injures the public because it protects the Department from paying additional costs when delays from utility relocation occur, and this protection then serves as a disincentive for the Department to use every legal tool available to expedite the completion of public works projects, which in turn can allow the cost of the projects to become inflated. This type of argument is one that we are not willing to accept because it is a path that has no good end. If we decide that the exculpatory clause hurts the public because it could eventually lead to inflated costs on public work projects, then it is not that great a leap to decide that the under-

---

1. Ind.Code § 8–23–2–6(a)(14).

lying public work projects injure the public because they cost too much. It is not the judiciary's role to decide how to best allocate State funds, and we will not wrest the control of the purse from its proper authority.

The Contractor also argues that the exculpatory clause is contrary to public policy. In determining whether a contract not prohibited by statute nor which tends to injure the public contravenes public policy, we look at five factors:

(1) the nature of the subject matter of the contract; (2) the strength of the public policy underlying any relevant statute; (3) the likelihood that refusal to enforce the bargain or term will further any such policy; (4) how serious or deserved would be the forfeiture suffered by the party attempting to enforce the bargain; and (5) the parties' relative bargaining power and freedom to contract.

*Trimble,* 700 N.E.2d at 1129–30. We then determine the enforceability of the contract by balancing these five considerations. *Cont'l Basketball Ass'n,* 669 N.E.2d at 140.

The subject matter of this contract was the reconstruction of a public road. The enforcement of this type of contract is a matter of public concern; however, the existence of an exculpatory clause that shifts the risk of delay for utility relocation to the contractor does not negatively impact this concern. If any statute is relevant for purposes of determining the second and third factors of this balancing test, it is Indiana Code § 8–23–2–6, which authorizes the Department to "[c]ontract with persons outside the Department to do those things that in the commissioner's opinion cannot be adequately or efficiently performed by the [D]epartment." I.C. § 8–23–2–6(a)(2). Implicit in this authorization is the principle that the Department is also free to allocate risks when it contracts with third parties and to receive the benefit of its bargain.

For the fourth factor, we look at how serious and deserved the forfeiture suffered would be if the exculpatory clause was not enforced. While it is arguable that the Department did not do everything in its power to shorten the delay for the utility relocation, there is no evidence that the Department did anything to actually create the delay. The Department does not deserve to lose the benefit of its bargain because of the actions of third-party utilities. In determining the last factor of the test, we recognize that while the contract was not open to negotiation except for price, the Contractor was free to make a bid that contemplated the possibility of delay or to decide to not pursue the contract if it did not want to assume the risk of delay. The contract, including the Standard Specifications, was available for the Contractor to review for weeks before it made its bid and eventually entered into the contract. We do not find that the Department's power in setting the terms of the contract is dispositive when the Contractor had the ability to review the contract and was free to pass the project on to some other contractor if it did not want to accept all of the conditions. After balancing the relevant considerations, we conclude that this exculpatory clause is not contrary to public policy.

### C. Superior Knowledge

Finally, the Contractor asserts that even if the exculpatory language in the contract was enforceable as a matter of law, it still would not bar a claim under Count IV of its complaint that alleged breach of contract for failure to disclose superior knowledge. We disagree.

The superior knowledge doctrine is not a cause of action in and of itself; rather, it is a doctrine that in limited circumstances supplies the basis for a

claim of breach of contract against the government. *GAF Corp. v. United States,* 932 F.2d 947, 949 (Fed.Cir.1991), *reh'g denied, cert. denied; R.J. Wildner Contracting Co. v. Ohio Turnpike Comm'n,* 913 F.Supp. 1031, 1042 (N.D.Ohio 1996). The doctrine of superior knowledge is generally applied to situations where:

(1) a contractor undertakes to perform without vital knowledge of a fact that affects performance costs or duration, (2) the government was aware the contractor had no knowledge of and had no reason to obtain such information, (3) any contract specification supplied misled the contractor or did not put it on notice to inquire, and (4) the government failed to provide the relevant information.

*Hercules Inc. v. United States,* 24 F.3d 188, 196 (Fed.Cir.1994), *cert. granted and aff'd. on other grounds by* 516 U.S. 417, 116 S.Ct. 981, 134 L.Ed.2d 47 (1996).

 The superior knowledge doctrine is a doctrine found in federal common law and has been accepted by some states. *See Gen. Motors Corp. v. Northrop Corp.,* 685 N.E.2d 127, 138 (Ind.Ct.App.1997), *trans. denied.* While Indiana has not formally recognized the superior knowledge doctrine, we have recognized a cause of action for breach of contract where the government failed to fully disclose the known conditions at a project worksite, or provided inaccurate information. *City of Indianapolis v. Twin Lakes Enters., Inc.,* 568 N.E.2d 1073, 1076–77 (Ind.Ct.App. 1991), *reh'g denied, trans. denied.* By finding a cause of action for a breach of contract in *Twin Lakes Enterprises,* where the government possessed material information needed by the contractors but failed to provide it, we adopted the superior knowledge doctrine in practice if not by name.

In *Twin Lakes Enterprises,* an exculpatory clause found in the contract did not protect the city of Indianapolis from a breach of contract claim based on a superior knowledge type theory. The exculpatory clause in *Twin Lakes Enterprises* stated:

Bidders shall examine the site and thoroughly familiarize themselves with the site and all conditions in connection therewith. Lack of familiarity with the site and present conditions will not be considered as justification for changes or extra charges of any kind, since any contract, in whole or in part will be based on the assumption the bidder knows, understands and accepts these existing conditions.

*Twin Lakes Enterprises,* 568 N.E.2d at 1076. We found that the exculpatory clause in the *Twin Lakes Enterprises* contract did not protect against a breach of contract claim because the "plans and specifications contained no information about the obstructions" present at the work site. *Id.*

However, in this case, the exculpatory clause and the contract materials do not suffer from the same flaw found in *Twin Lakes Enterprises.* The exculpatory clause found in § 105.06 of the Standard Specification reads in pertinent part:

*The plans show all known utilities located within the limits of the contract according to information obtained from the various utility companies. The accuracy of the plans in this respect is not guaranteed by the Department.* All of the permanent and temporary utility appurtenances in their present or relocated positions shall have been considered in the bid. No additional compensation will be allowed for delays, inconvenience, or damage sustained by the Contractor due to interference from the said utility appurtenances or the operations of moving them

Appellant's App. P.61–62 (emphasis added). The exculpatory clause informed all contractors seeking to bid on the project that the information concerning the location of the utility fixtures had been obtained from the utilities and that the Department would not guarantee the accuracy of the information. In a revision to Standard Specifications § 107.24, included in the original contract bid package, the Department identified the utilities in the roadwork area, provided the utilities' estimated timetables for utility relocation, and supplied the phone numbers and names of individuals at the utilities who should be contacted if questions arose concerning the relocation. Appellant's App. P.410–11.

The contract not only provided contact information for the various utility companies in the area, but also instructed the Contractor to contact the utilities before it began any work on the project. Section 107.19 of the Standard Specifications reads in pertinent part "Regardless of previous notification by the Department, the Contractor shall give notice to the owners of each utility located within the contract limits, or which might be affected by the work, in sufficient time before beginning work for the owners to relocate or protect their property." Appellant's App. P.64.

▬▬ Unlike the exculpatory clause in *Twin Lakes Enterprises,* the exculpatory clause in this case, coupled with the additional contract provisions, placed the Contractor on notice about the possibility of problems involving utility relocation and supplied the appropriate information needed for inquiries on this issue. We find that the exculpatory clause in this case is effective to protect against a claim of breach of contract under the doctrine of superior knowledge. Therefore, we conclude that the trial court erred when it failed to dismiss the Contractor's contract claims on summary judgment.[2]

## II. Tort Claims Act

The Department contends that the trial court erred in denying summary judgment on Count IV, V and VI of the complaint alleging superior knowledge, estoppel and constructive fraud because the Contractor failed to comply with the notice and filing requirements of the Indiana Tort Claims Act.[3] As we noted earlier, superior knowledge is a contract claim; therefore, we will only focus on the allegations that the Contractor's claims of constructive fraud and estoppel are barred by the Tort Claims Act.

▬▬ The Indiana General Assembly enacted the Tort Claims Act in order to establish procedures for cases involving prosecution of tort claims against governmental entities. *Clifford v. Marion County Prosecuting Attorney,* 654 N.E.2d 805, 808 (Ind.Ct.App.1995). The Tort Claims Act provides that a suit against the state is barred unless notice of the claim is given to the attorney general or the involved state agency within 270 days of the loss. *Ricketts v. State,* 720 N.E.2d 1244, 1246 (Ind.Ct.App.1999), *trans. denied;* Ind. Code § 34–13–3–6. The purpose of the notice requirement is to inform state officials with reasonable certainty of the accident or incident and surrounding circumstances and to advise of the injured party's intent to assert a tort claim so that the

---

**2.** We note that Contractor also argued that it had a constitutional right under the Indiana Constitution to have its contract claims against the state tried before a jury. However, because we find that the Contractor's contract claims do not survive summary judgment, we will not address this additional argument.

**3.** Ind.Code § 34–13–3–1 *et seq.* (formerly Ind. Code ch. 34–4–16.5).

state may investigate, determine its possible liability, and prepare a defense to the claim. *Id.*

In responding to the Department's motion for summary judgment, the Contractor relies on *Underwood v. City of Jasper Municipal Utility Service Board*, 678 N.E.2d 1280 (Ind.Ct.App.1997), *reh'g denied, trans denied,* for the proposition that its claims do not fall under the Tort Claims Act because certain torts are not covered by the Act. In *Underwood,* another panel of this court found that not all tort claims against the state involved an "injury to or death of a person or damage to property" as to qualify as a "loss" within the meaning of the Act, and the Tort Claims Act would not apply to those torts. 678 N.E.2d at 1283–84 (concluding that claims for compensation for improperly charged sewer rates and damages from alleged misrepresentations did not involve losses as contemplated by the Indiana Tort Claims Act). While the Contractor's reliance on *Underwood* is understandable, the *Underwood* conclusion relating to the Tort Claims Act was flawed because it was based on a decision that had been vacated by our supreme court, *Holtz v. Board of Commissioners of Elkhart County*, 548 N.E.2d 1220 (Ind.Ct.App.1990), *trans. granted and opinion vacated by* 560 N.E.2d 645 (Ind.1990). *Underwood,* 678 N.E.2d at 1283–84.

In *Holtz v. Board of Commissioners of Elkhart County*, 560 N.E.2d 645 (Ind.1990), our supreme court granted transfer, set aside the opinion of the Court of Appeals, and affirmed the trial court's decision that barred the claim for failure to provide notice as required by the Tort Claims Act. In rendering its decision, our supreme court determined what types of losses would fall under the Tort Claims Act. "Loss," for purposes of the Indiana Tort Claims Act, "means injury to or death of a person or damage to property." Ind.

Code § 34–6–2–75 (formerly Ind.Code § 34–4–16.5–2(e)). In interpreting this language, our supreme court rejected the Court of Appeal's construction later relied on in *Underwood* and concluded:

> We cannot interpret the Tort Claims Act as applying only to some torts.
>
> Even applying the strictest construction, we find that the only logical interpretation to place upon the term "loss" in the statutory definition is to find that the legislature clearly intended to include all torts committed against either persons or property.

*Holtz,* 560 N.E.2d at 647–48. Therefore, the Contractor relies on a vein of legal reasoning that was rejected by our supreme court and must be rejected by us. In *Holtz,* our supreme court held that the Tort Claims Act applies to all torts. *See Bienz v. Bloom,* 674 N.E.2d 998, 1003 (Ind. Ct.App.1996), *trans. denied.* Thus, we conclude that the Tort Claims Act applies to corporate lost profits and additional costs if the claim requesting compensation for those damages sounds in tort.

### A. Constructive Fraud

In Count VI of its complaint, the Contractor requested relief under a claim of constructive fraud. The elements of constructive fraud are:

> (1) a duty owing by the party to be charged to the complaining party due to their relationship; (2) violation of that duty by the making of deceptive material misrepresentations of past or existing facts or remaining silent when a duty to speak exists; (3) reliance thereon by the complaining party; (4) injury to the complaining party as a proximate result thereof; and (5) the gaining of an advantage by the party to be charged at the expense of the complaining party.

*Rice v. Strunk,* 670 N.E.2d 1280, 1284 (Ind.1996). Even though a constructive

fraud claim can relate to a contract, it is grounded in duty, breach of duty and deceit. *Orem*, 711 N.E.2d at 869. Hence, a constructive fraud claim is a tort, and the Indiana Tort Claims Act applies to this claim. *Id.*

The Department presented uncontroverted evidence that the Contractor never filed a notice of tort claim either with the Department or with the Office of the Indiana Attorney General. Appellant's App. P.66–67. Without the proper filing of the notice of tort claim, the Contractor's constructive fraud claim is barred by the Tort Claims Act. Accordingly, we conclude that the trial court erred when it denied summary judgment on the constructive fraud claim.

### B. Estoppel

In Count V of its complaint, the Contractor requested relief under a claim of estoppel. The Department argues that the Indiana Tort Claims should also bar this claim because the Contractor failed to file a tort claim notice. We agree.

Estoppel springs from equitable principles and is designed to aid the law in the administration of justice where, without the equitable remedy, injustice might result. *First Nat'l Bank of Logansport v. Logan Mfg. Co., Inc.*, 577 N.E.2d 949, 954 (Ind.1991). The doctrine of equitable estoppel is invoked when: (1) a representation or concealment of material fact; (2) made by a person with knowledge of the fact and with the intention that the other party should act upon it; (3) to a party ignorant of the matter; (4) induces the other party to act upon it to his detriment. *Ind. Dep't of Envtl. Mgmt. v. Conard*, 614 N.E.2d 916, 921 (Ind.1993). The doctrine of estoppel does not, in and of itself, constitute an independent cause of action. *Pepkowski v. Life of Ind. Ins. Co.*, 535 N.E.2d 1164, 1167 (Ind.1989). Therefore, estoppel cannot be considered a claim of tort, but rather an equitable remedy that can prevent injustice when the law cannot provide effective relief for the tortious conduct.

Because estoppel is not a tort but rather an equitable remedy, the Indiana Tort Claims Act does not directly apply to the doctrine. However, estoppel is relief that can be granted by a court when there has been tortious conduct committed:

> The basis for the doctrine of equitable estoppel is fraud, either actual or constructive, on the part of the person estopped. Constructive fraud is fraud that arises by operation of law from conduct which, if sanctioned by the law, would secure an unconscionable advantage.... The result of the conduct triggers the application of the theory.

*Paramo v. Edwards*, 563 N.E.2d 595, 598 (Ind.1990); *Stafford v. Barnard Lumber Co., Inc.*, 531 N.E.2d 202, 205 (Ind.1988) (quoting *Lawshe v. Glen Park Lumber Co., Inc.*, 176 Ind.App. 344, 375 N.E.2d 275, 278 (1978)). It stands to reason that if the underlying claim of fraud or constructive fraud would be barred by the Tort Claims Act if proper notice was not filed, then relief, even equitable relief, for that claim would also be barred from the failure to file proper notice.

In this case, the Contractor asserted in its complaint that the doctrine of equitable estoppel should be invoked because "as a proximate result of its reasonable reliance on the promises, actions and representations of [the Department], [the Contractor] has sustained damages in an amount exceeding one million dollars. It would be inequitable to require [the Contractor] to bear the burden of a loss caused solely by [the Department]." Appellant's App. P.20. The underlying tortious conduct from which the Contractor was requesting equitable relief was fraud, either actual or constructive. If the Tort Claims Act would

bar the Contractor's underlying cause of action, then the relief requested by the Contractor based on that conduct must also be barred. Thus, we conclude that the trial court erred when it found that the Tort Claims Act did not bar the request for the remedy of estoppel.

### Conclusion

In interpreting the contract between the Department and the Contractor, the trial court erroneously found that the exculpatory clause did not limit claims for damages under the contract for delays caused by utility relocation. In addition, the trial court also erred when it found that the Indiana Tort Claims Act did not bar the Contractor's claim of constructive fraud and request for the remedy of estoppel. Therefore, we reverse the trial court's denial of summary judgment and remand with instructions to grant summary judgment in favor of the Department.

Reversed and remanded.

DARDEN, J., and MATHIAS, J., concur.