**David MACKIEWICZ, Appellant–Plaintiff,**

v.

**William METZGER, Lost Lakes, Inc., Wilcoin, Inc., Lake Group, Inc., Warrick County Area Plan Commission, Appellees–Defendants.**

No. 82A01–0003–CV–70.

Court of Appeals of Indiana.

June 6, 2001.

Robert R. Faulkner, Evansville, IN, Attorney for Appellant.

David V. Miller, Robert L. Burkart, Ziemer Stayman Weitzel & Shoulders, LLP, Evansville, IN, C. Richard Martin, Martin & Martin, Boonville, IN, Attorneys for Appellees.

## OPINION

FRIEDLANDER, Judge.

David Mackiewicz purchased a lakefront lot in what shortly thereafter was platted as a subdivision. A subsequent plat for an adjoining subdivision called for the creation of a roadway by constructing a levee across the lake at a point near Mackiewicz's property, thereby restricting Mackiewicz's ability to easily access a significant portion of the lake. In a lawsuit filed against William Metzger, Lost Lakes, Inc., Wilcoin, Inc., Lake Group, Inc. (unless otherwise indicated, hereinafter collectively referred to as "Developers"), and the Warrick County Area Plan Commission (the Plan Commission), Mackiewicz thereafter sought monetary damages and an injunction against future actions that might further restrict his access to the lake. In due course, the parties filed several summary judgment motions. Mackiewicz appeals the denial of his second motion for partial summary judgment, as well as the granting of summary judgment motions filed on behalf of Developers and the Plan Commission, respectively. Upon appeal, Mackiewicz presents the following restated issues for review:

1. Did the trial court err in granting summary judgment in favor of Developers?

2. Did the trial court err in granting summary judgment in favor of the Plan Commission?

3. Did the trial court err in denying Mackiewicz's summary judgment motion?

We affirm.

The undisputed facts are that in 1992, James Harris and Jerry Aigner agreed to form a company called Wilcoin, Inc. for the purpose of launching a real estate venture. Harris and Aigner negotiated with Peabody Land Development, Inc. and eventually agreed to purchase approximately 2000 acres of undeveloped, unplatted land in Warrick County, Indiana. A portion of the land in question had been strip-mined, which resulted in the creation of a series of stripper pit lakes. Some of those lakes were interconnected. By the time of the purchase, Aigner had ceased his involvement in the venture with Harris. Thereafter, Harris incorporated Wilcoin and completed the purchase of the real estate. Eventually, Wilcoin's large parcel of land was divided into smaller parcels. Within those smaller parcels are located certain parcels of real estate relevant to this appeal. Those parcels of real estate are the Paradise Lakes Exempt Division (Wilcoin Exempt Division), the Paradise Lakes Subdivision, the Lake Group Land, and the Lake Group Exempt Division.

In 1992, Mackiewicz was serving in the United States Navy in Virginia. He intended to return home to Indiana when his tour with the Navy ended, so he was interested in purchasing real estate on which to build a house. He became aware that Wilcoin was going to auction lots in the Wilcoin Exempt Division. After some research, he authorized his parents to attend the auction, where, on October 9, 1992, they placed a successful bid on his behalf for tract 15A. On that same day, Mackiewicz's parents signed on his behalf a document entitled "Building and Occupancy Restrictions [—] Paradise Lakes [hereinafter referred to as "the Restrictions"]." *Supplemental Record* at 146. Paragraph 6 of that document is central to the instant controversy and provides:

> All lakes common to the boundary of Paradise Lakes may be used by all lot and/or tract owners. No gasoline or diesel engines, 10 horsepower (H.P.) or above, will be permitted. No jet skis will be permitted.

> All lot and/or tract owners adjoining the lakes shall be responsible for their part of maintenance of the lake and must keep lake free from debris and other foreign materials. Lot and/or tract owners adjoining lake must abide by restrictions as set forth by the Paradise Lakes Association for perpetual maintenance of the lake and appurtenances thereto.

*Supplemental Record* at 148. The above restrictions explicitly provided that they applied only to the specified lots (*i.e.*, lots 1–15A and 26–77 in the Wilcoin Exempt Division). Mackiewicz signed a purchase agreement for the lot on October 10, 1992.

We have included a crude diagram of the real estate in controversy. We caution that the diagram is not to scale and is intended only for purposes of clarification. In very general terms, tract 15A was triangular in shape, with two of the sides running north-south and east-west, respectively, while the hypotenuse of the triangle ran generally from northeast to southwest. The property line that we refer to herein as the hypotenuse was formed generally by a portion of a stripper pit lake, which ran a considerable distance in each direction beyond the boundaries of lot 15A.

The Wilcoin Exempt Division plat was recorded on December 14, 1992. On February 3, 1993, Wilcoin recorded building and occupancy restrictions relating to tracts 1 through 26 and lots 27 through 77 of the Wilcoin Exempt Division. The Wilcoin Exempt Division plat reveals, however, that there are no lots number 27 through 77; the Wilcoin Exempt Division, as platted, was comprised of only tracts 1 though 20 and tract 15A. On April 30, 1993, Wilcoin recorded the plat of the Paradise Lakes Subdivision. On May 25, 1993, Wilcoin recorded building and occupancy restrictions relative to Paradise Lakes. In 1994, Lake Group, Inc. purchased approximately 1500 acres from Wilcoin. We will refer herein to that land as the Lake Group land. No portion of the Wilcoin Exempt Division or the Paradise Lakes Subdivision is or was ever located within the Lake Group land. Moreover, the special warranty deed by which Wilcoin conveyed the Lake Group land did not subject that land to the restrictions imposed upon residents of the Wilcoin Exempt Division.

On September 27, 1996, Lake Group, Inc. recorded a plat for the Lake Group land, thereby forming the Lake Group Exempt Division. Parcel 3 of the Lake Group Exempt Division was located across the stripper pit lake that formed the hypotenuse boundary of Mackiewicz's tract 15A. Parcel 4 of the Lake Group Exempt Division was located directly south of Parcel 3. Sometime after the Lake Group Ex-

empt Division Plat was recorded, Lake Group, Inc. constructed a roadway (hereinafter referred to as the "access levee") across the stripper pit lake at approximately the location where Parcels 3 and 4 intersected, by pushing in the sides of the stripper pit and filling it in with dirt at that point. The access levee was contained entirely on Lake Group Exempt Division land and did not encroach upon Mackiewicz's property or any other property located within the Wilcoin Exempt Division. The access levee, which was located approximately 500 feet south of the southern border of tract 15A, blocked Mackiewicz's access to a considerable portion of the stripper pit lake system.

On March 31, 1997, Mackiewicz filed a six-count Verified Complaint for Injunctive Relief, Declaratory Judgment and Damages, naming as defendants the Plan Commission, William Metzger (an officer of Lake Group, Inc.), Lost Lakes, Inc., Wilcoin, Inc., and Lake Group, Inc. Mackiewicz filed an amended complaint on April 9, 1997. Under Count I of the amended complaint, Mackiewicz sought an order against Metzger and Lake Group, Inc. enjoining them from "further interfering with [Mackiewicz's] access rights," *Record* at 38, and from maintaining the access levee, based upon the allegation that the recording of the Lake Group plat deprived him of valuable property rights without compensation or due process of law. Under Count II, Mackiewicz sought from Metzger and Lake Group compensatory and punitive damages, plus costs and attorney fees, based upon the allegation that Metzger and Lake Group, acting with malice and intent, wrongfully deprived Mackiewicz of his riparian rights. Under Count III, Mackiewicz sought monetary damages from the Plan Commission pursuant to 42 USC §§ 1983 and 1988, based upon the allegation that the Plan Commission had violated Mackiewicz's constitutional rights

by depriving him of vested property rights without due process of law. Under Count IV, Mackiewicz sought monetary damages from the Plan Commission upon the allegation that approving the Lake Group plat amounted to an inverse condemnation of his property. Under Count V, Mackiewicz sought a declaratory judgment to the effect that the designation of the Lake Group Subdivision as an exempt subdivision was an erroneous designation, that the recording of the subdivision was a nullity, and that the subdivision is not exempt from the Warrick County Subdivision Control Ordinance. Finally, under Count VI, Mackiewicz sought damages from Wilcoin based upon Wilcoin's alleged failure to "take affirmative steps to enforce the building and occupancy restrictions for Paradise Lakes", *Record* at 63, and upon Wilcoin's alleged breach of the purchase agreement signed by Mackiewicz.

On May 22, 1997, Developers filed a motion to dismiss Counts I and II of Mackiewicz's amended complaint. In an August 27, 1999 order, the court denied the motion to dismiss, "but indicate[d] Plaintiff's theory of reparian [sic] rights [was] not viable." Record at 159. On November 3, 1997, Developers filed a motion seeking summary judgment on Counts I, II, and V of Mackiewicz's complaint. On December 23, 1997, Mackiewicz filed a general motion for summary judgment. The court denied both motions following a hearing.

On January 30, 1998, the Plan Commission filed a motion for summary judgment in which it relied upon the previous summary judgment motion filed by Developers, as well as the affidavit of Phyllis Gagnon, the Executive Director of the Plan Commission. The trial court denied the Plan Commission's motion for summary judgment on April 21, 1998. On August 4, 1998, Developers filed their second motion

for summary judgment. The second motion was substantially similar to the first, differing only in that Developers designated additional materials in support of their motion. On October 12, 1998, Mackiewicz filed a Renewed Motion for Partial Summary Judgment. On January 19, 1999, the trial court granted Developers' second motion for summary judgment with respect to Counts I, II, and V of Mackiewicz's complaint and denied Mackiewicz's motion for partial summary judgment. On February 16, 1999, the trial court entered findings and conclusions in support of its January 19 rulings.

On March 2, 1999, the Plan Commission filed a renewed motion for summary judgment on Counts III and IV of Mackiewicz's complaint. The Plan Commission sought summary judgment upon the ground that its liability, if any, to Mackiewicz was derivative of the liability of the developer defendants, which had already been exonerated of liability to Mackiewicz by virtue of the January 19 summary judgment ruling. As the Plan Commission explained in its motion, "[t]he cause of action against Warrick County Area Plan Commission is, basically, that its allegedly wrongful conduct enabled the wrongful conduct of the [developer] defendants." *Record* at 765. The Plan Commission continued that, because the trial court had determined as a matter of law that the developer defendants were not liable to Mackiewicz, then the Plan Commission "could have done nothing actionable by allegedly enabling" the conduct that formed the basis of Mackiewicz's claim against the defendant developers. *Id.* The trial court granted the Plan Commission's renewed motion for summary judgment on August 4, 1999. Mackiewicz appeals the granting of the summary judgment motions submitted by Developers and the Plan Commission, and the denial of Mack-

iewicz's motion for partial summary judgment.

 When reviewing a ruling on a summary judgment motion, we apply the same standard of review as did the trial court:

[S]ummary judgment is appropriate only where the evidence shows there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. All facts and reasonable inferences drawn from those facts are construed in favor of the nonmoving party. The review of a summary judgment motion is limited to those materials designated to the trial court. We must carefully review decisions on summary judgment motions to ensure that the parties were not improperly denied their day in court.

*Tom–Wat, Inc. v. Fink*, 741 N.E.2d 343, 346 (Ind.2001) (citations omitted).

1.

 Mackiewicz contends that the trial court erred in granting summary judgment in favor of Developers. The fundamental question presented is whether an easement exists that confers upon Mackiewicz a right to access the entire stripping pit lake system without having to take his boat out of the water.

 Mackiewicz's first contention is that "[t]he plain language" of paragraph 6 creates an easement that ensures Mackiewicz's right to access the entire stripping pit lake system. In order to create a valid easement, a document must identify with reasonable certainty the easement created and the dominant and servient tenements relative thereto. *See Tanton v. Grochow*, 707 N.E.2d 1010 (Ind.Ct.App.1999).

The document upon which Mackiewicz relies expressly applied only to tracts 1 through 26 (the Wilcoin Exempt Subdivi-

sion) and lots 27 through 77 of Paradise Lakes. By its own terms, the document does not purport to burden anyone outside of the Wilcoin Exempt Division and Paradise Lakes. The restrictions do not describe the boundaries or composition of the development referred to therein as "Paradise Lakes." Therefore, we are unable to identify the physical scope of the right set forth of all Paradise Lake lot owners to use "all lakes common to the boundary of Paradise Lakes." *Supplemental Record* at 148. Moreover, to the extent that paragraph 6 can be understood to create a right to unimpeded access to any or all of the stripper pit lake system, it is devoid of explanations or descriptions that aid in identifying the affected dominant or subservient tenements. It certainly does not purport to burden any land that is not a part of what the Restrictions referred to as "Paradise Lakes." In short, the document containing the restrictions upon which Mackiewicz relies does not set forth the information necessary to create a valid easement, at least with respect to land that is not located within the Wilcoin Exempt Division.

In the instant case, this omission may not be cured by looking beyond the document, whether it be to the then-existing circumstances, or to the views of Harris with respect to what he believed at the time. *See Oakes v. Hattabaugh*, 631 N.E.2d 949, 952 (Ind.Ct.App.1994) ("[w]e refuse [the] invitation to look beyond the deeds because the terms are plain and unambiguous; no dominant tenements are identified. Furthermore, the intention of the original parties will not control the plain and unambiguous terms of the deed as against third persons"), *trans. denied.* Moreover, the restrictions imposed upon lots in the Wilcoin Exempt Division are not mentioned in the deed or chain of title by which Wilcoin conveyed Parcels 3 and 4 to Lake Group, Inc. Therefore, we discern nothing in the plain language of the instruments relative to the Lake Group land that would impose upon Lake Group lots those restrictions relating to the Wilcoin Exempt Division.

■ Mackiewicz's second—and primary—argument upon this issue is essentially this: Even if paragraph 6 did not include plain language that, with respect to Lake Group land, created an enforceable right to easily access the entire stripper pit lake system, such a right exists because all of the subdivisions in question were part of a common scheme or plan. In support of this contention, Mackiewicz cites *Corner v. Mills*, 650 N.E.2d 712 (Ind. Ct.App.1995) as authority for the proposition that "[w]here owners can trace their title to a common source of title and the circumstances demonstrate a common plan or scheme for development restrictive covenants will be enforceable against one another, notwithstanding the fact that some lots do not specifically have such covenants in the chain of title." Appellant's Brief at 18.

In *Corner*, the owners of a tract of land purchased in 1937 divided that tract into thirty-two individual residential lots and named the development "Christiana Acres." Between 1939 and 1941, four of the lots were sold to purchasers without restrictions. In 1942, a lot was sold with restrictions relating to the cost, type, size, and location of buildings that could be constructed on the lots, the use to which the buildings could be put, and restrictions on the ethnicity of persons who purchased the lots. In the following years, two additional lots were sold, one with the above restriction attached and the other without them. The Christiana Acres tract was recorded in 1946. At that time, all owners of the lots were in compliance with the restrictions, and all joined in the record-

ing. No restrictions were included in the tract record.

The next thirteen lots were conveyed after the tract was recorded in 1946. Some of these thirteen lots included restrictions similar to the ones set out above, while others had certain residential restrictions but no racial covenants. In addition, one lot was conveyed "subject to restrictions of record." *Id.* at 713. Another was conveyed with only one of the original restrictions.

In March 1993, several Christiana Acres property owners, whose property was located near a commercialized street that abutted the subdivision, decided that their properties would be more valuable if used commercially. Therefore, they filed a complaint for declaratory relief seeking to have the restrictive covenants on their properties lifted. Other owners in the subdivision responded and filed a counterclaim seeking enforcement of the covenants. After conducting a hearing, the trial court upheld the residential restrictions on Christiana Acres, and the plaintiffs appealed.

This court affirmed the trial court upon our conclusion that the facts of *Corner* reflected that a general scheme or plan of residential development existed in Christiana Acres. We held that the lack of uniformity in restrictions applicable to the various lots that were sold throughout the years in Christiana Acres did not conclusively prove the nonexistence of a general plan or scheme for residential development. We also concluded that the fact that some of the lots contained no restrictions, that a few lots were conveyed before the plat was recorded, or that the recorded plat itself contained no restrictions, did not conclusively demonstrate that such a plan did not exist. We held that, in determining whether a general scheme or plan of development exists, the pertinent focus is upon whether the circumstances and facts of the case, including the language of the deeds and the grantors' actions, revealed an intent to create such a plan or scheme. *Id.* In reaching this conclusion, we found the following passage persuasive:

> Where a common grantor opens up a tract of land to be sold in lots and blocks, and before any lots are sold, inaugurates a general scheme of improvement for such entire tract intended to enhance the value of each lot, and each lot subsequently sold by such grantor, is made subject to such scheme of improvement, there is created and annexed to the entire tract what is termed a negative equitable easement, in which the several purchasers of lots have an interest, and between whom there exists mutuality of covenant and consideration.

> \* \* \* \* \* \*

> The failure of the developer to include uniform restrictions in all deeds, or his failure to include any restrictions in one or more deeds, would not of itself take away all of the rights of the other purchasers to have the district maintained as a restricted residential district. If [such a] proposition is correct then a sub-divider might sell hundreds of lots for enhanced prices, upon the representation that the district was to be a restricted residential district, and then by his failure either through inadvertence or otherwise, to include such restrictions in one or more deeds, destroy the entire scheme or general plan for a restricted residential sub-division. We are of the opinion that a general plan or scheme may exist, although some of the lots were sold without restrictions.

*Corner v. Mills,* 650 N.E.2d at 715–16 (quoting *Elliot v. Keely,* 121 Ind.App. 529, 98 N.E.2d 374, 379 (1951), *trans. denied*).

For their part, Developers cite *Kuchler v. Mark II Homeowners Ass'n, Inc.* 412 N.E.2d 298 (Ind.Ct.App.1980) in support of their contention that the Restrictions did not create an easement or right to that effect that was enforceable against owners of Lake Group land. In *Kuchler*, a subdivision consisting of approximately eighty-two acres was developed in three sections. The final plat for Section I was recorded in June 1973. Eleven lots had been sold from this section when, in April 1974, the developer recorded a document entitled, "Declaration of Covenants and Restrictions." This document created various restrictions and covenants upon the property then owned by the developer, including a mandatory homeowners association, which was to maintain a common ground of two acres through mandatory assessments that could be collected through liens on the various lots. The common ground was placed in Section III. The document envisioned a not-for-profit corporation consisting of all the lot owners to run the common ground.

In 1974, the plat was recorded for Section II. This plat referred to the Recorded Declaration as a further restriction on the property in the form: "That all of the lots contained in the above plat or any portion thereof shall be subject to the further conditions as contained in an instrument entitled declaration of covenants and restrictions as recorded in miscellaneous record 50, page 41 in the office of the recorder of Johnson County, Indiana." *Id.* at 299. The plat for Section III was recorded in May 1975. The third plat did not refer to the Recorded Declaration as a restriction on the property.

In April 1978, four lot owners held an organizational meeting in order to establish a homeowners association. Two days later, articles of incorporation were filed and the corporation was certified. In Sep-

tember 1978, a complaint for declaratory judgment was filed questioning the Declaration as a burden on the plaintiff homeowners' land. The trial court determined that the plaintiffs in Sections I and III were not burdened by the restrictions, but that the homeowners in Section II were. Both sides, the homeowners in Section II and the homeowners association, appealed the trial court's ruling.

Upon appeal, this court affirmed the trial court. In so doing, we held that when a parcel of land is divided into separate parcels, it is the final platting that determines whether restrictions are applicable to some or all of the separately platted parcels. Specifically, we held that because there were three separate plats, "in effect, there [were] three separate developments or subdivisions." *Id.* at 300. Finally, we cited with approval the rule that "where the grantor's entire tract of land is developed in separate sections and not as a single unit, there is no general plan or scheme which would permit owners in all the subdivisions to enforce restrictive covenants against each other." *Id.*

We are left, then, to decide which of the two cases, *Corner* or *Kuchler*, controls in the instant case. We conclude that the facts in *Kuchler* are more analogous to those present in the instant case, and therefore the rule enunciated in that case controls the outcome here. In *Corner*, the entire subdivision in question was recorded as a single tract. The question to be resolved was whether restrictions encumbering some of the lots were applicable to all. It was eminently reasonable to harmonize the restrictions of all of the lots in the subdivision because those lots were indeed all parts of one discrete whole. That is, the same owner sold each lot and the lots were part of a single subdivision that was recorded as such. Those critical facts are not present in the instant case.

Here, the restrictions burdening the lots in the Wilcoin Exempt Division were not explicitly or otherwise imposed upon any other land. Moreover, Mackiewicz seeks to enforce those restrictions against property owners of parcels of land located within an entirely different subdivision—a subdivision that was platted and developed by Lake Group, Inc., not Wilcoin. These facts are more like those in *Kuchler*, where this court held that separate developments do not support a finding of a general plan or scheme such as would permit owners in all of the subdivisions to enforce restrictive covenants against each other. Therefore, pursuant to *Kuchler v. Mark II Homeowners Ass'n, Inc.*, 412 N.E.2d 298, we conclude that the trial court did not err in holding that there was no general scheme or plan between the Wilcoin Exempt Division and the Lake Group land that would justify imposing upon the Lake Group land restrictions relating to Wilcoin Exempt Division property.

■ Mackiewicz's third and final contention is that the trial court erred in failing to exercise its equitable jurisdiction and refusing to prevent "an unconscionable wrong and injustice." Appellant's Brief at 22. Specifically, Mackiewicz invokes the equitable maxim that "[e]quity will not suffer a wrong without a remedy." *See Magnant v. Ambulatory Renal Services, Inc.*, 575 N.E.2d 1029, 1034 (Ind.Ct.App.1991). We conclude that the maxim does not apply here.

As we have indicated previously, the restrictions by which Mackiewicz seeks to assail Lake Group's right to build and maintain the access levy were vague with respect to the scope of their application, and the identity of the dominant and servient tenements. Moreover, by their own terms, they failed to guarantee that which Mackiewicz seeks herein to enforce, *i.e.*,

that he had a legally enforceable right to prevent others not specifically mentioned in the restrictions from in any way blocking his access, from his property, to the entire stripper pit lake system. To the extent that Mackiewicz was thereby "wronged," it was primarily a result of his failure to ensure, when he purchased tract 15A, that he had obtained such an enforceable right. Under these circumstances, we conclude that the trial court did not err in refusing to invoke its equitable powers to do for Mackiewicz what he could have done for himself in the first place.

In summary, the trial court did not err in granting summary judgment in favor of Developers.

2.

Mackiewicz contends that the trial court erred in granting summary judgment in favor of the Plan Commission. As indicated previously, the Plan Commission sought summary judgment upon the grounds that its liability in this lawsuit was dependent upon the liability of the developer defendants, and that the summary adjudication in favor of Developers necessarily meant that the Plan Commission was entitled to summary judgment.

■ We note that, unlike its ruling upon Developers' summary judgment motion, the trial court did not enter findings and conclusions in granting summary judgment in favor of Plan Commission. Nevertheless, our standard of review is the same regardless of whether the trial court enters findings and conclusions. *Grzan v. Charter Hosp. of Northwest Indiana*, 702 N.E.2d 786 (Ind.Ct.App.1998). With or without findings, we stand in the shoes of the trial court and will affirm on appeal if the ruling is sustainable on any theory or basis found in the designated material. *Id.*

To the extent that Plan Commission's liability was dependent upon Developers' liability, Developers' success on their motion required that the trial court grant Plan Commission's motion. Mackiewicz contends, however, that there was an independent basis of liability that rendered summary judgment in favor of the Plan Commission erroneous. Specifically, Mackiewicz contends that the Plan Commission violated his constitutional due process rights when it failed to observe a statutory mandate to provide notice and an opportunity to be heard to owners of adjoining property when presented with a plat. Mackiewicz contends that the Plan Commission's failure to provide him with such notice violated his constitutional due process rights, thereby entitling him to nominal, compensatory, and punitive damages.

Mackiewicz notes that zoning bodies are created by statute and must exercise their authority in strict compliance with the relevant statutory provisions. He contends that Ind.Code Ann. § 36–7–4–705 (West 1997) required the Plan Commission to set a public hearing at which to consider primary plat approval when presented with a plat. We note, however, that IC § 36–7–4–701(d) (West 1997) provides an exception to the notice and hearing requirement in cases where the proposed subdivision "does not involve the opening of a new public way and ... complies in all other respects with the subdivision control ordinance and the zoning ordinance." In such cases, a plat "may be granted primary approval by the plat committee without public notice and hearing, subject to appeal to the plan commission." *Id.*

At all times relevant to this appeal, Phyllis Gagnon was the Executive Director of the Planning Commission. In conjunction with the Planning Commission's summary judgment motion, Gagnon submitted an affidavit attesting to the fact that the Lake Group Exempt Division plat did not require the opening of a new roadway, and that it complied in all other respects with the subdivision control ordinance and the zoning ordinance. In other words, the exception to the notice and hearing requirement set out in IC § 36–7–4–701(d) applied in this case and, by statute, the Plan Commission was not required to provide notice and hearing prior to approving the plat.

▬ In a separate argument, Mackiewicz contends that a prior decision of this court refutes the Plan Commission's contention that it may not enforce private covenants and restrictions, thereby rendering summary judgment for the Plan Commission inappropriate. In *Ad Craft, Inc. v. Area Plan Comm'n of Evansville and Vanderburgh County*, 716 N.E.2d 6 (Ind.Ct.App.1999), this court determined that a planning commission does indeed have the authority to enforce private covenants and restrictions. This is not to say, however, that such an entity is *obligated* to enforce private restrictions. This court did not go that far in *Ad Craft, Inc.*, and we decline to do so now.

### 3.

Finally, Mackiewicz contends that the trial court erred in denying his motion for partial summary judgment. Mackiewicz's motion for partial summary judgment includes the same issues that were presented in the summary judgment motions of Developers and the Plan Commission, but advocates the opposite side of those arguments. Having determined that the trial court did not err in ruling in favor of Developers and the Plan Commission on those issues, we necessarily conclude that Mackiewicz's partial summary judgment motion was properly denied.

Judgment affirmed.

RILEY, J., concurs.

SULLIVAN, J., concurring with separate opinion.

SULLIVAN, Judge, concurring

I fully concur in the majority opinion which affirms the summary judgment entered in favor of William Metzger, Lost Lakes, Inc., and Lake Group, Inc. as well as in favor of the Warrick County Area Plan Commission. In doing so, however, I believe it important to point out that summary judgment was not entered in favor of Wilcoin, Inc., the original developer and the entity which sold Lot 15A to Mackiewicz. As related to this sale, Mackiewicz was afforded access to "[a]ll lakes common to the boundary of Paradise Lakes...."[1] Supplemental Record at 148.

1. All the real estate contemplated to be developed in the area of the connected stripper pit lakes was referred to as "Paradise Lakes."

To this extent, therefore, I must necessarily conclude that Mackiewicz's claim for monetary damages against Wilcoin, Inc. under Count VI of the complaint remains viable and the matters in issue as to that litigation are as yet unresolved.

In this sense, therefore, I am unable to wholly agree with the majority's conclusion that "[t]o the extent that Mackiewicz was thereby 'wronged,' it was primarily a result of his failure to ensure, when he purchased tract 15A, that he had obtained such an enforceable right." Op. at 821. Although one might reasonably argue that Mackiewicz did not do everything within his power to protect his interests, it might also be true that Wilcoin, Inc. incurred liability for its failure to protect his access to all lake areas.

Subject to this caveat, I concur.