Anna KING, William H. Stuckey and Crystal Stuckey, Appellants–Plaintiffs,

v.

Eric C. EBRENS and Jennifer M. Ebrens, Appellees–Defendants.

No. 24A01–0308–CV–308.

Court of Appeals of Indiana.

March 11, 2004.

George A. Leininger, Ewbank, Kramer & Dornette, Lawrenceburg, IN, Lowell C. McMillin, Mullin, McMillin & Rychener, Brookville, IN, Attorneys for Appellants.

David W. Stone IV, Stone Law Office, Anderson, IN, Jerome J. Charls, Harrison, OH, Attorneys for Appellees.

## OPINION

NAJAM, Judge.

## STATEMENT OF THE CASE

In January 2002, Anna King and William and Crystal Stuckey ("the Homeowners") filed their complaint for injunctive relief seeking an order from the trial court that Eric and Jennifer Ebrens remove a pole barn that the Ebrens had built on their property. The complaint alleged that the pole barn violated a restrictive covenant. The Homeowners and the Ebrens filed cross-motions for summary judgment, and the trial court granted the Ebrens' motion and denied the Homeowners' motion. The Homeowners now appeal and present the following dispositive issue for review: whether the trial court erred when it entered summary judgment for the Ebrens.

We affirm.

## FACTS AND PROCEDURAL HISTORY

In 1979, Donald and Elaine Smith purchased a tract of land, containing approximately 101 acres, in Franklin County. A part of the tract fronted on Spaeth and Reservoir Roads, and at the time the Smiths acquired the tract, they intended to divide that part into lots for single family residential development. In 1979, the Smiths did not have a lot configuration in mind, nor did they have a timetable by which the lots were to be sold for development.

In 1980, the Smiths conveyed a lot to Nicholas and Anna King[1] by Warranty Deed. The King's Deed contains several restrictive covenants, which provide in relevant part:

## RESTRICTIVE COVENANTS

The following restrictive covenants are to run with the land and shall be binding upon all parties and all persons claiming under them until January 1, 2000, at which time said covenants shall be automatically extended for successive periods of ten (10) years unless changed by a vote of the majority of the then-owners of the lots covered by these restrictive covenants.

(1) The real estate shall be used for residential purposes only. Only a single-family dwelling may be erected on the real estate. The dwelling must have an attached garage of sufficient size for a minimum of two (2) cars and a minimum width of twenty-four (24) feet.

\* \* \*

(4) No structure shall be erected or placed on the real estate other than the dwelling above referred to.

\* \* \*

(18) These restrictions may be modified and exception made thereto, if 80% of

---

1. Nicholas is now deceased.

the owners of similarly-situated land and the grantor, should he own adjacent land, even though unrestricted, so agree.

In 1983, the Smiths conveyed another lot by Warranty Deed, which contained the same restrictive covenants, to William and Crystal Stuckey. Thereafter, the Smiths continued to sell portions of the remaining property in a piecemeal manner. They sold parts of the property that fronted on Spaeth and Reservoir Roads, in addition to other property that did not front those roads. But all property sold that fronted on Spaeth and Reservoir Roads contained the same or similar restrictive covenants as those which appear in King's and the Stuckeys' Deeds.

In 1993, the Smiths sold the remaining three lots that fronted on Spaeth and Reservoir Roads. However, instead of selling the lots in the same piecemeal fashion, the Smiths platted those lots together as the Don Smith Subdivision. They did this to comply with Franklin County's Unified Zoning Ordinance. The Plat of the Don Smith Subdivision contains substantially the same restrictive covenants as those which appear in King's and the Stuckeys' Deeds, including the covenant that "No structure shall be erected or placed on the real estate other than the dwelling above referred to." That Plat was recorded in June 1993. Both King's and the Stuckeys' lots abut lots in the Don Smith Subdivision and appear on the Plat. However, King's and the Stuckeys' lots are not part of the Don Smith Subdivision.

In 1995, the Smiths sold Tract # 2 of the Don Smith Subdivision to Jennifer Ebrens, who at that time was known as Jennifer Weileman.[2] The Warranty Deed, recorded in February 1995, described the conveyed real estate in part as, "Tract Number Two (2) in Don Smith Subdivision, . . . and subject to the Restrictive Covenants as recorded in Plat Book B page 226–227, Slide No. 187, on June 10, 1993, as appears in the records in the office of the Recorder of Franklin County, Indiana." The Stuckeys' lot is immediately west of the Ebrens' lot, and the southeasterly portion of King's lot abuts the north property line of the Ebrens' lot.

In October 2001, the Ebrens received approval from Franklin County to construct a 30 × 40 foot pole barn on their lot. After the Ebrens began construction, counsel for King sent a letter to the Ebrens advising them that they were in violation of Restrictive Covenant # 4, as contained in the Plat. The Ebrens thereafter completed construction of their pole barn.

In January 2002, the Homeowners filed a complaint for injunctive relief.[3] In April 2002, the Homeowners filed a summary judgment motion, and in December, the Ebrens filed a cross-motion. The trial court issued its Order in May 2003, which provides in relevant part:

> IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that Plaintiffs' Motion for Summary Judgment filed April 16, 2002 is hereby denied and Defendants' Motion for Summary Judgment filed on December 6, 2002 is hereby granted.

The Homeowners filed a Motion to Correct Error, which the court denied. This appeal ensued.

2. Jennifer later married Eric, and in 2001, a Warranty Deed containing both their names was recorded.

3. Mark Kolb was originally a plaintiff in the suit, but in April 2002, he filed a voluntary dismissal under Indiana Trial Rule 41. Kolb was the only plaintiff who owned a lot in the Don Smith Subdivision.

## DISCUSSION AND DECISION

### Standard of Review

When reviewing the grant or denial of summary judgment, we use the same standard used by the trial court. *Allstate Ins. Co. v. Smith,* 656 N.E.2d 1156, 1157 (Ind. Ct.App.1995). Summary judgment is appropriate only when the evidentiary matter designated by the parties shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. *Id.;* Ind. Trial Rule 56(C). In the context of cross-motions for summary judgment, the trial court must deal with each motion separately, construing the facts and inferences to be drawn therefrom in a light most favorable to the non-moving party. *Allstate,* 656 N.E.2d at 1157. If the facts are undisputed, our task is to determine the law applicable to those facts, and whether the trial court correctly applied it. *Id.*

### The Homeowners' Standing

The dispositive substantive issue presented is whether the Homeowners, who do not own property in the Don Smith Subdivision, have standing to enforce the restrictive covenant in the Plat that prohibits the Ebrens from erecting a pole barn. The Homeowners assert that they have standing on two grounds. First, they point out that the Homeowners' Deeds contain substantially the same restrictive covenants as those contained in the Plat of the Don Smith Subdivision, and according to covenant number 18, such restrictions may only be modified, or an exception made thereto, if 80% of the owners of *similarly-restricted land* agree to the modification. Stated differently, the Homeowners allege that they have standing to enforce the covenant because their property is "similarly-restricted" to the Eberns'. The Homeowners also contend that they have standing because all of the parties' lots were sold by a common grantor, the Smiths, who had a common scheme or plan for development, which created mutual rights among all of the grantees, not just those grantees who own lots within the Don Smith Subdivision. The Ebrens counter that the Homeowners lack standing because they do not own property in the Don Smith Subdivision. We address their arguments in turn.

### A. The Smiths' Amended Affidavit

■ Initially, we address the dispute over the Smiths' Amended Affidavit, which the Homeowners designated in support of their summary judgment motion. In that Amended Affidavit, the Smiths state, among other things, that after they acquired the 101 acres in 1979, they "had a common and general plan in selling off pieces of the parent parcel for construction thereon of single family residences to provide that each and every tract so conveyed would be subject to the same mutually enforceable restrictive covenants...." The Smiths' Amended Affidavit was executed on April 22, 2002.

Thereafter, on September 9, 2002, the Ebrens' counsel took Don Smith's deposition. During the deposition, counsel asked Smith whether he had a "master plan" for the development of the property that fronted Spaeth and Reservoir Roads. Smith stated that he did not have a master plan. Based on Smith's denial that he had a "master plan" for the property during his deposition, the Ebrens argue on appeal that Smiths' Amended Affidavit should not be considered because it conflicts with Smith's deposition testimony. In support, they cite case law which sets forth the general rule that a party cannot create an issue of fact by submitting an affidavit that contradicts prior deposition testimony. *Schlosser v. Rock Industries, Inc.,* 796 N.E.2d 350, 358 (Ind.Ct.App.2003); *Ga-*

*boury v. Ireland Road Grace Brethren, Inc.*, 446 N.E.2d 1310, 1314 (Ind.1983). They also direct us to a case in which the Seventh Circuit Court of Appeals determined that the same rationale applies where the affidavit is given before the deposition testimony. *See Darnell v. Target Stores,* 16 F.3d 174, 177 (7th Cir.1994). Further, the Ebrens maintain that the Affidavit contains conclusory statements that are not supported by designated evidence.

But the Ebrens did not raise their objections to the Smiths' Amended Affidavit to the trial court. Rather, they assert for the first time on appeal that the Amended Affidavit should not be considered. It is well settled that arguments not presented to the trial court on summary judgment are waived on appeal. *See KPMG, Peat Marwick, LLP v. Carmel Fin. Corp., Inc.*, 784 N.E.2d 1057, 1063 (Ind.Ct.App.2003). Thus, the Ebrens have waived any challenge to the Smiths' Amended Affidavit.

### B. Restrictive Covenant Number 18

■ The Homeowners first assert that they have standing to enforce the restrictive covenant that prevents the Ebrens from erecting a pole barn based on the language of restrictive covenant number 18, which provides: "These restrictions may be modified and exception made thereto, if 80% of the owners of similarly-restricted land and the grantor, should he own adjacent land, even though unrestricted, so agree." Specifically, the Homeowners contend that because their property and the Ebrens' property are "similarly-restricted," the Homeowners have standing to enforce the covenants.

As an initial matter, the Homeowners are not a party to the restrictive covenants which appear on the Plat of the Don Smith Subdivision and are incorporated by reference in the Ebrens' Deed. Rather, the parties to those restrictive covenants are the Smiths, the grantors, and the owners of the platted lots. *See Bob Layne Contractor, Inc. v. Buennagel*, 158 Ind.App. 43, 301 N.E.2d 671, 678 (1973) (stating restrictive covenant "is a contract between two parties setting forth certain restrictions upon the use and occupancy of land for consideration."). But the Homeowners claim, in effect, that they are third-party beneficiaries of the restrictive covenants between the Smiths and the Ebrens and, because of that status, they have standing to enforce the covenants against the Ebrens. Based on our review of the language of restrictive covenant number 18 and the Plat as a whole, we cannot agree.

■ As this court stated in *Grandview Lot Owners Ass'n Inc. v. Harmon*, 754 N.E.2d 554, 557 (Ind.Ct.App.2001):

> One purpose of restrictive covenants is to maintain or enhance the value of land "by controlling the nature and use of lands subject to a covenant's provisions." Restrictive covenants are generally disfavored in the law and will be strictly construed by the courts, which resolve all doubts in favor of the free use of property and against restrictions. Nevertheless, restrictive covenants are a form of express contract recognized under the law. The construction of a written contract containing restrictive covenants is a question of law for which summary judgment is particularly appropriate.

(Citations omitted). In addition, only where the intent of the parties cannot be determined within the four corners of the document do we examine extrinsic facts. *Campbell v. Spade*, 617 N.E.2d 580, 584 (Ind.Ct.App.1993). We have explained this rule of construction as follows:

> The original covenanters' intent must be determined from the specific language used and the situation as it existed at the time that the covenant was made.

Specific words and phrases cannot be read exclusive of other contractual provisions. Rather, the parties' intentions when entering into the contract must be determined by reading the contract in its entirety and attempting to construe contractual provisions so as to harmonize the agreement.

*Grandview*, 754 N.E.2d at 557 (citations omitted).

 "When lands are granted according to a plat, the plat becomes part of the grant or deed by which the land is conveyed, with respect to the limitations placed upon the land." *Id.* And "[a] duly recorded plat gives notice to all prospective purchasers of the restrictions contained therein." *Id.* Here, the Plat was recorded in 1993. Accordingly, in determining the meaning of restrictive covenant number 18, we look not only to the restrictive covenants, but we also look at the Plat.

 Restrictive covenant number 18 does not define the term "similarly-restricted land." Nor do any of the other restrictive covenants provide a definition. "Words used in a contract are to be given their usual and common meaning unless, from the contract and the subject matter thereof, it is clear that some other meaning was intended." *Grandview*, 754 N.E.2d at 559. The common meaning of "similar" is "related in appearance or nature; alike though not identical." THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 1682 (3d ed.1996).

In addition to the plain meaning of "similar," the Deed of Dedication, which also appears on the Plat, identifies the parties and the property subject to the restrictions in relevant part as follows:

[THE] RESTRICTIONS HERETOFORE STATED ARE TO RUN WITH THE LAND AND SHALL BE BINDING ON ALL PARTIES AND ALL PERSONS CLAIMED UNDER THEM UNTIL JANUARY 1, 2017, AT WHICH TIME SAID RESTRICTIONS SHALL BE AUTOMATICALLY EXTENDED FOR SUCCESSIVE PERIODS OF TEN YEARS UNLESS CHANGED BY VOTE OF *A MAJORITY OF THE THEN OWNERS OF THE BUILDING SITES COVERED BY THESE RESTRICTIONS IN WHOLE OR IN PART.*

(Emphasis added). The term "building sites" in the Deed of Dedication clarifies the term "similarly-restricted land" as used in restrictive covenant number 18. In particular, when the Deed of Dedication is read in conjunction with restrictive covenant number 18, and these provisions are harmonized, "similarly-restricted land" means the other "building sites" within the Don Smith Subdivision. *See Grandview*, 754 N.E.2d at 557 (requiring courts to read contract in its entirety and attempt to construe provisions so as to harmonize agreement).

 The Homeowners' lots appear on the Plat, but those lots are identified by deed record and page, not as building sites. Rather, only three platted building sites are identified, namely, Tract # 1, Tract # 2, and Tract # 3. We therefore conclude that, according to the express language of the Plat, only owners of building sites within the Don Smith Subdivision are "owners of similarly-restricted land" for purposes of restrictive covenant number 18. Because the Homeowners do not own one of the three building sites, their reliance on restrictive covenant number 18 to support their standing argument must fail.[4]

4. In a related argument, the Homeowners note that the Plat provides that the three

Still, in support of their interpretation of restrictive covenant number 18, the Homeowners direct us to a statement in the Smiths' Amended Affidavit which suggests that the Smiths intended the "similarly-restricted" language to mean that the owners of each and every similarly restricted tract, regardless of whether the lot was contained within the Don Smith Subdivision, would have the right to enforce the restrictive covenants. Accordingly, the Homeowners rely on extrinsic evidence. But as we explained in *Roy A. Miller & Sons, Inc. v. Indus. Hardwoods Corp.*, 775 N.E.2d 1168, 1172–73 (Ind.Ct. App.2002):

> We determine the parties' intent when entering a contract from their expressions within the four corners of the written instrument. If the language is clear and unambiguous, we give that language its "plain, usual, and ordinary meaning." If, on the other hand, the language is ambiguous, then we must determine its meaning by extrinsic evidence.

Here, considering, as we must, both the plain meaning of the term "similarly-restricted" and the Plat as a whole, including the Deed of Dedication, we have determined that "similarly-restricted land" as used in restrictive covenant number 18 means other "building sites" within the Don Smith Subdivision. Accordingly, that term is not ambiguous and we need not resort to extrinsic facts.

### C. Common Scheme or Plan for Development

The Homeowners also assert that they have standing to enforce the restrictive covenants against the Ebrens because the evidence shows that the Smiths had a common scheme or plan for development[5] of the property wherein all lots sold from the original tract that fronted Spaeth and Reservoir Roads would be subject to the same restrictions, including the restriction that no structure other than a dwelling be erected or placed on the properties. The Homeowners present an issue of first impression in our State, namely, whether a general plan of development exists where the original grantor's entire tract of land is developed in separate sections over time and not as a single unit.

This court recognized the concept of a general plan of development in *Elliot v.*

Tracts in the Don Smith Subdivision are subject to "all restrictions of record." They appear to suggest that this general provision confers standing on them to enforce the covenants contained in the Plat against owners of homes in the Don Smith Subdivision. However, they do not explain how that general provision supports their standing argument, nor do they provide any citations to authority. Because the Homeowners have failed to present cogent argument on the issue, their argument is waived. *See* Ind.App. Rule 46(A)(8)(a) (providing appellant must contain contentions on issues presented and each contention must be supported by cogent reasoning, including citations to authority); *see also Young v. Butts*, 685 N.E.2d 147, 151 (Ind.Ct. App.1997) (stating "court which must search the record and make up its own arguments because a party has not adequately presented them runs the risk of becoming an advocate rather than an adjudicator."). In any event, although the Homeowners' individual lots were restricted of record before the Don Smith Subdivision was platted, neither the individual lots nor the Plat are in each other's direct chain of title. Thus, the general boilerplate provision in the Plat that the platted Tracts are subject to "all restrictions of record" does not incorporate the restrictions in the Homeowners' Deeds by reference or confer standing on the Homeowners to enforce those restrictions against owners of the platted tracts.

5. The phrase "common scheme or plan" is also referred to as "general plan." *See* RESTATEMENT (THIRD) OF PROPERTY: SERVITUDES § 2.14 ("Servitudes Implied from General Plan"). We use those phrases interchangeably throughout this opinion.

*Keely,* 121 Ind.App. 529, 98 N.E.2d 374, 379–80 (1951), as follows:

> Where a common grantor opens up a tract of land to be sold in lots and blocks, and before any lots are sold, inaugurates a general scheme of improvement for such entire tract intended to enhance the value of each lot, and each lot subsequently sold by such grantor, is made subject to such scheme of improvement, there is created and annexed to the entire tract what is termed a negative equitable easement, in which the several purchasers of lots have an interest, and between whom there exists mutuality of covenant and consideration.
>
> The fact that a general plan was not filed and that the restrictions in the different deeds, although similar, are not identical, is not conclusive, so long as it appears that it was [the] general intent of the grantors to impose restrictions for the benefit of lot owners generally.
>
> * * *
>
> [Where the original grantors adopt a general plan or scheme of development and restrict it in some manner], [s]uch a restriction not only imposes a liability upon the grantee of each lot as between him and the grantor, but it gives him a right in the nature of an easement, which will be enforced in equity against the grantee of one of the other lots, although there is no direct, contractual relation between the two. Through the common character of the deeds the grantees are given an interest in a contractual stipulation which is made for their common benefit.

(Citations omitted).

Since *Elliot,* our courts have addressed the common scheme or plan of development doctrine in only a few cases. *See e.g., Wischmeyer v. Finch,* 231 Ind. 282, 107 N.E.2d 661, 665 (1952) (finding general plan of development where single subdivision plat restricted lots to residential use and type of buildings allowed); *Mackiewicz v. Metzger,* 750 N.E.2d 812, 821 (Ind. Ct.App.2001) (stating trial court did not err in finding no general scheme or plan of development where different developers platted separate subdivisions and only one subdivision was subject to restrictions at issue), *trans. denied; McIntyre v. Baker,* 660 N.E.2d 348, 352 n. 2 (Ind.Ct.App.1996) (addressing common scheme or plan in footnote where no dispute between the parties regarding whether common plan existed); *Corner v. Mills,* 650 N.E.2d 712, 715–16 (Ind.Ct.App.1995) (finding common plan where subdivision was recorded in single plat); *Kuchler v. Mark II Homeowners Ass'n, Inc.,* 412 N.E.2d 298, 300 (Ind.Ct.App.1980) (citing with approval Colorado Court of Appeals' holding that "where grantor's entire tract of land is developed in separate sections and not as a single unit, there is no general plan or scheme which would permit owners in all the subdivisions to enforce restrictive covenants against each other."). While none of those cases is directly on point, our analysis in *Kuchler* is helpful.

In *Kuchler,* homeowners who resided in the Mark II Subdivision in Johnson County filed a declaratory judgment action against the Mark II homeowners association, a not-for-profit corporation, questioning the powers of the corporation under a recorded Declaration of Covenants and Restrictions. *Id.* at 299. The Mark II Subdivision was developed in three sections, Sections I, II, and III. The final plat for Section I was recorded in June 1973. After the developer had sold eleven lots in Section I, in 1974 the developer recorded in the Miscellaneous Records a document entitled, "Declaration of Covenants and Restrictions," which contained various re-

strictions and covenants upon all property then owned by the developer and which required a homeowners association to maintain a "common ground" that was located in Section III of the subdivision. *Id.* In April 1974, the plat was recorded for Section II of the subdivision, and that plat referred to the Recorded Declaration as a restriction on the property. In May 1975, the plat for Section III was recorded without reference to the Recorded Declaration. *Id.*

In September 1978, the plaintiff homeowners filed their complaint, and one of the issues raised was whether the Recorded Declaration placed restrictions on the homeowners' property. The trial court determined that the Recorded Declaration applied to Section II and that Sections I and III were not burdened by the Recorded Declaration. *Id.* On appeal, the homeowners argued that after the developer had sold eleven lots in Section I, he could not place further restrictions on Sections II and III. *Id.* On that issue, we stated as follows:

Implicit in this argument is the notion that the Mark II Subdivision is an integrated whole. It is true that a preliminary plat of the entire 82[-]acre tract was presented to the zoning board for approval. It is, however, the final plat that is of importance in recording and deeding the property by lot number. *See* Ind.Code [§ ] 17–3–43–1. And here, there are three separate plats and thus, in effect, there are three separate developments or subdivisions. *We note that it has been held that where the grantor's entire tract of land is developed in separate sections and not as a single unit, there is no general plan or scheme which would permit owners in all the subdivisions to enforce restrictive cove-*

*nants against each other. Rooney v. Peoples Bank of Arapahoe County,* [32 Colo.App. 178, 182, 513 P.2d 1077, 1080 (1973) ] (and cases cited therein). If treated, then, as separate entities, we have no problem with the placing · of further restrictions on other sections. *Id.* at 299–300 (emphasis added).[6] We further determined that although none of the deeds for the lots in either Section II or III contained the Recorded Declaration, the recorded plat for Section II incorporated by reference the Recorded Declaration. Thus, all lots in Section II were burdened by the Recorded Declaration and the restrictions and covenants contained therein. But because the plat for Section III did not reference the Declaration, those lots were not so burdened. *Id.* at 300.

Although in *Kuchler* we did not expressly adopt the holding in *Rooney v. Peoples Bank of Arapahoe County,* 32 Colo.App. 178, 513 P.2d 1077, 1080 (1973), we cited that case with approval. And we find *Rooney* analogous to the facts here. Specifically, in *Rooney* the owners (the Rooneys) of a lot in one subdivision called "Range View, Second Filing," sought to enforce a restrictive covenant against the Bank, which owned a lot in an adjacent subdivision called "Range View Subdivision." *Id.* at 1079. Both subdivisions were developed and platted by the same grantors, the Buchanans. *Id.* The Buchanans had owned a large tract of land and over time, they platted five separate subdivisions, two of which were Range View Subdivision and Range View, Second Filing. Both the lot owned by the Bank and the Rooneys' lot were restricted by the same covenants. *Id.* The issue before the Colorado Court of Appeals was whether the Rooneys could enforce the covenants against the Bank, and the Rooneys argued that they could

---

**6.** Whether the remaining unsold lots in Section I were burdened by the Recorded Declaration was not an issue on appeal. *Kuchler,* 412 N.E.2d at 300, n. 1.

because both subdivisions were part of a general plan or scheme of development. The court disagreed and stated in relevant part:

> [The common scheme or plan] rule is applicable to owners of lots within Range View Subdivision. It appears from the plat of the subdivision, and from the restrictive covenants applicable to the lots in this plat, that Range View Subdivision was developed under a general plan or scheme. However, the rule does not authorize owners of lots in subsequently platted subdivisions to enforce the covenants with regard to lots in other subdivisions unless all five subdivisions were developed as a part of a general plan or scheme for the development of the entire area.
>
> The five subdivisions were developed as separate and distinct units. A separate plat was filed for each subdivision. *The tract was not developed as a single contemporaneous unit. In similar factual situations, courts of other jurisdictions have held that where the grantor's entire tract of land is developed in separate sections and not as a single unit, there is no general plan or scheme which would permit owners in all the subdivisions to enforce restrictive covenants against each other.*

Id. at 1080 (citations omitted and emphasis added). Thus, the court determined that no general scheme or plan existed and that

the trial court correctly determined that the Rooneys could not enforce the covenants against the Bank. *Id.*

Here, although the Homeowners' Deeds and the Plat of the Don Smith Subdivision share the same restrictive covenants, the undisputed designated evidence establishes that the Smiths did not develop their entire 101–tract of land "as a single contemporaneous unit." *Id.* Rather, they first sold lots to the Homeowners piecemeal and then subsequently platted the Don Smith Subdivision.[7] While the evidence shows a common scheme or plan for the Don Smith Subdivision, we cannot conclude that the Smiths had a common scheme or plan for their entire 101–acre tract, nor for the property that fronted Spaeth or Reservoir Roads.[8] Indeed, following the holding in *Rooney*, we hold that the Smiths did not have a general plan of development for the property that fronted on Spaeth and Reservoir Roads because they sold and developed that land not as a single unit but, at first, in separate lots and, later, by way of a subdivision. Without a general plan of development, the Homeowners, who do not own lots within the Don Smith Subdivision, do not have standing to enforce the restrictive covenants contained in the Plat against the Ebrens. Thus, the trial court properly granted summary judgment for the Ebrens.

Affirmed.

---

**7.** We disagree with the dissent's contention that this case is like *Corner*. While the developers in *Corner* sold lots in a piecemeal fashion, they did so only *after* they had divided their original tract into thirty-two individual residential lots and named that development "Christiana Acres." 650 N.E.2d at 713–714. Unlike the Smiths who sold a few lots individually and then platted the Don Smith Subdivision, the developers in *Corner* developed and platted a single subdivision. Thus, we agree that there was a common scheme or plan of development in *Corner* because the entire tract was developed as a single contempora-

neous unit. *See Rooney*, 513 P.2d at 1080. But here, the Smiths developed their property in phases over time. Further, and significantly, unlike the Homeowners here, who do not own lots in the Don Smith Subdivision, the plaintiffs in *Corner* owned lots in Christiana Acres. *Id.* at 714.

**8.** This opinion does not address whether the Homeowners may enforce the restrictive covenants contained in their deeds against one another.

MAY, J., concurs.

BAKER, J., dissents with separate opinion.

BAKER, Judge, dissenting.

I respectfully dissent from the majority's determination that Anna King, William H. Stuckey, and Crystal Stuckey (Homeowners) do not have standing to enforce the restrictive covenants contained in the Plat against the Ebrens. In my view, *Corner v. Mills* makes it clear that a general scheme or plan of a development exists when "the circumstances and facts of the case, including the language of the deeds and the grantors' actions, reveal an intent by them to create such a plan or scheme." 650 N.E.2d 712, 715 (Ind.Ct. App.1995). It is apparent to me that the evidence, when viewed in the light most favorable to the Homeowners, reveals such an intent on the part of Donald Smith.

The majority cites *Corner* for the proposition that a common plan will exist where a subdivision is recorded in a single plat. Op. p. 829. The *Corner* court's decision, however, is based on the idea that the facts of the case can indicate that a grantor had a common scheme of development in mind when he or she sold off plots of a larger tract of land. *Corner*, 650 N.E.2d at 715. Specifically, I would note that in *Corner*, the Shuperts purchased a tract of land in 1942 that was subsequently sold off piece by piece. The first four lots sold had no restrictions. Lot Number 11 was sold off with a list of restrictions, including one that prevented the land from being used for any purpose except for residential use. Two lots were sold after Lot Number 11, but only one of them had the residential use restriction. In 1946, the Shuperts recorded a plat of the tract and named the area Christiana Acres. Thirteen lots were sold after the recording, some included

restrictions in their deeds while others did not. *Id.* at 714.

In 1993, Marie Corner—who owned one of the plots that originally was purchased by the Shuperts—decided to use her plot for commercial purposes. She petitioned the trial court to strike the residential restrictions. The trial court upheld the residential restrictions, finding a common scheme or plan of residential development. *Id.*

On appeal, Corner argued that the trial court's finding was erroneous because "some of the covenants are ambiguous and ... many of the deeds are not identical in their restrictions." *Id.* at 715. Corner also argued that "some properties do not have restrictions on them at all, and ... several lots were conveyed without restrictions before the plat was recorded." *Id.* We affirmed the trial court, however, noting that "the pertinent focus is on whether the circumstances and facts of the case, *including the language of the deeds and the grantors' actions*, reveal an intent by them to create such a plan or scheme." *Id.* (emphasis added). Furthermore, we noted that:

> [W]here a common grantor opens up a tract of land to be sold in lots and blocks, and before any lots are sold, inaugurates a general scheme of improvement for such entire tract intended to enhance the value of each lot, and each lot subsequently sold by such grantor, is made subject to such scheme of improvement, there is created and annexed to the entire tract what is termed a negative equitable easement, in which the several purchasers of lots have an interest, and between whom there exists mutuality of covenant and consideration.

*Id.* at 715–16 (quoting *Elliot v. Keely*, 121 Ind.App. 529, 539–40, 98 N.E.2d 374, 379 (1951)). The *Corner* court acknowledged

that some plots' deeds did not contain the restrictions but also held that this did not "conclusively show the nonexistence of" a common scheme or plan. *Id.* at 715.

If the *Corner* court found sufficient evidence to demonstrate a common scheme or plan, then here the Homeowners have at least successfully raised a genuine issue of material fact to preclude the entry of summary judgment. All parties had a common grantor, Donald R. Smith. Additionally, Smith's affidavit stated that he:

[H]ad a common and general plan in selling off pieces of the parent parcel for construction thereon of single family residences to provide that each and every tract so conveyed would be subject to the same mutually enforceable restrictive covenants so as to assure that each tract conveyed would have constructed thereon no more than one single family dwelling with an attached garage.

Appellant's App. p. 43. Even more telling, the King and Stuckey tracts had the same restriction with respect to structures as did the subdivision lots. Appellant's App. p. 19, 20, 23. Finally, the reason the platted subdivision came into existence was external. The Franklin County Area Planning Commission's executive director stated that "[T]he Unified Zoning Ordinance of Franklin County, Indiana[,] would not have allowed [the Smiths] to convey the [lots later included in the subdivision] as separate building lots which would each be entitled to receive an improvement location permit to allow construction of a residence thereon unless those tracts had been platted into a Subdivision." Appellant's App. p. 52.

I also note that the Ebrens were not without notice. All the parcels at issue here were part of Smith's original tract. The deeds from the lots that made up the original tract could have been inspected to determine which lots were within Smith's original common plan. I would also note that the Ebrens's answer alleged that they advised William H. Stuckey that the pole barn was going to be erected before construction began. Appellant's App. p. 38. Stuckey did not object to the proposed project. Appellant's App. p. 38. If such an allegation is true, the Homeowners' claim for equitable relief may have been compromised under the doctrine of laches. *Black's Law Dictionary* 875 (6th ed. 1990) ("Equity aids the vigilant and not those who slumber on their rights").

In short, summary judgment was not warranted here inasmuch as a genuine issue of material fact exists as to whether Smith had a common scheme or plan in mind when he began selling parts of his original tract for homesteads. However, because the Homeowners are seeking equitable relief, I would permit the Ebrens to more fully develop their affirmative defense of laches.